IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

TEVIN MITCHELL, TYVONNE
WILEY, and TOREY STARLING,

     Defendants.

CRIMINAL CASE NO.
1:17-CR-122-LMM-LTW

---

### MAGISTRATE JUDGE'S ORDER, FINAL REPORTAND RECOMMENDATION AND ORDER CERTIFYING CASE READY FOR TRIAL

     Defendants Tevin Mitchell, Torey Starling, and Tyvonne Wiley are charged with several counts of Hobbs Act robbery, brandishing a firearm during a crime of violence, and conspiracy to commit Hobbs Act robbery. The Defendants' charges stem from seven robberies of GameStops and Hibbett Sports in Oklahoma, Texas, and Georgia. (Doc. 69). Each Defendant has filed motions, which are now pending before the Court. (Docs. 47-48, 58-64, 85, 91). Defendant Tevin Mitchell ("Mitchell") has moved to suppress evidence and statements obtained from him on the grounds that police officers unlawfully arrested him without probable cause, and unlawfully interrogated him during the period of arrest. (Docs. 63-64).

     Defendant Starling has moved to dismiss Count One of the original Indictment on the grounds that Count One charges him and his co-defendants with conspiracy to commit Hobbs Act robbery in Oklahoma, Texas, and Georgia even though there was no evidence

showing his involvement in any of the crimes in Texas or Oklahoma. (Doc. 47). Defendant Starling also moved to dismiss Count Two of the original Indictment for aiding and abetting a robbery which occurred at the Cobb Parkway GameStop, because there was no evidence showing his involvement in that particular robbery.  (Doc. 47). Starling also seeks to dismiss both counts of brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Counts Seven and Nine) from the Superseding Indictment because an agent of the United States admitted that Starling "ain't pulled no gun on nobody."  (Doc. 69, 91).

Defendant Wiley argues the charges in the Indictment against him should be dismissed because he has been improperly joined and because each of the three Defendants is alleged to have conspired in separate conspiracies with multiple offenses occurring in Oklahoma, Texas, and Georgia. (Doc. 58).  Defendant Wiley has also moved to suppress evidence seized as a result of his arrest on the grounds that neither the Texas warrant for his arrest nor his arrest in Cobb County on October 28, 2016, was based upon probable cause.  (Docs. 60, 85).  Additionally, Defendant Wiley argues the November 1, 2016 search warrant permitting Detective Raissi to take pictures of his tattoos should also be suppressed on the grounds that the warrant was not supported by probable cause since none of the robberies had been connected to him at the time the warrant issued. (Id.).

For the reasons outlined below, this Court concludes as follows:

(1)    Defendant Torey Starling's Motion to Dismiss Counts 1 and 2 of the Indictment should be **DENIED**.  (Doc. 47).

(2)    Defendant Torey Starling's Motion to Sever Parties is **DEFERRED TO THE**

2

**DISTRICT COURT**.  (Doc. 48).

(3)     Defendant Tyvonne Wiley's Motion to Dismiss or, in the Alternative, Motion to Sever Defendant should be **DENIED** as to the Motion to Dismiss, but **DEFERRED TO THE DISTRICT COURT** as to the Alternative Motion to Sever.  (Doc. 58, 61).

(4)     Defendant Tyvonne Wiley's Motion to Supress Defendant's Statements should be **DEFERRED TO THE DISTRICT COURT**.  (Doc. 59).

(5)     Defendant Tyvonne Wiley's Motion to Suppress any Evidence Pursuant to His Arrest and Evidence Obtained Pursuant to a Search Warrant of His Person and Supplemental or Particularized Motion to Suppress Evidence should be **DENIED**. (Docs. 60, 85).

(6)     Defendant Tevin Mitchell's Motion for a Bill of Particulars is **GRANTED IN PART AND DENIED IN PART.**  (Doc. 62).

(7)     Defendant Tevin Mitchell's Motion to Suppress Search and Seizure should be **GRANTED**.  (Doc. 63).

(8)     Defendant Tevin Mitchell's Motion to Suppress Statements should be **GRANTED**. (Doc. 64).

(9)     Defendant Torey Starling's Motion to Dismiss Count 7 and Count 9 of the Superseding Indictment should be **DENIED**.  (Doc. 91).

### DEFENDANT TEVIN MITCHELL'S MOTIONS TO SUPPRESS EVIDENCE AND STATEMENTS

On October 3, 2017, a grand jury in the Northern District of Georgia returned an Superseding Indictment charging Defendant Tevin Mitchell ("Defendant" or "Mitchell") with (1) conspiring to commit Hobbs Act Robbery in violation of 18 U.S.C. § 1951(a); (2) three counts of Hobbs Act Robbery and aiding and abetting his codefendants in the robberies in violation of 18 U.S.C. §§ 2 and 1951(a); and (3) three counts of brandishing a firearm during a crime of violence and aiding and abetting his co-defendants in doing

so in violation of 18 U.S.C. §§ 2 and 924(c)(1)(A)(ii). (Doc. 69). In Mitchell's Motions to Suppress, he argues police officers unlawfully arrested him without an arrest warrant and without probable cause, and unlawfully interrogated him during the period of arrest. (Docs. 63-64). Mitchell argues all evidence obtained and statements he made as a result of the officers' unconstitutional actions should be suppressed. (Id.).

## I.   FACTUAL BACKGROUND

### A.   The Texas Investigation

On September 20, 2016, Detective David Grubbs, who was a robbery detective with the police department in Dallas, Texas, obtained arrest warrants for Defendants Tevin Mitchell and Tyvonne Wiley from State District Judge Bennett in Dallas County, Texas. (Tr. 106-07, Gov't Ex. 5). Defendants Wiley and Mitchell were wanted in connection with the armed robbery of a GameStop in Dallas. (Tr. 106-07). Detective Grubbs explained to Judge Bennett that prior to obtaining the arrest warrants, he had security video footage of the robbery from the GameStop and body camera footage from a police officer who subsequently detained Wiley and Mitchell at a parking deck. (Tr. 109, 115, 117-18, 132). Grubbs explained that a tracker within the money stolen had been activated following the robbery. (Tr. 109, 115, 122). An officer was nearby at the time and stayed in proximity with the area where the tracker was giving updates. (Tr. 119; Gov't Ex. 5). After a Ford Fiesta turn into a parking lot, the signal went dead. (Tr. 119). Around that time, officers observed individuals later identified as Defendants

4

Tevin Mitchell and Tyvonne Wiley walking out of the parking garage[1] with an unknown female. (Tr. 109, 119; Gov't's Ex. 5). The officers detained the three individuals. (Tr. 119-20, 126-27). Law enforcement officers discovered that the female had a large quantity of money in her back pack, but she explained that she received the cash as a dancer. (Tr. 126-27, Ex. 5). The tracker was not found in the female's bag. (Tr. 127). The officers returned the money to the female and released her as well as Mitchell and Wiley. (Tr. 127; Gov't's Ex. 5).

The officers subsequently found the Ford Fiesta in the parking deck. (Tr. 120; Gov't's Ex. 5). Officers observed a rifle wrapped in a light-colored pillow case in plain view on the back seat of the Ford Fiesta. (Tr. 121, Gov't's Ex. 5). The rifle appeared to be the same weapon used in the armed robbery. (Tr. 121). The officers also saw latex gloves in the front of the vehicle. (Gov't's Ex. 5). Officers later learned the Ford Fiesta was registered to Defendant Mitchell. (Tr. 109, 115, 124; Gov't's Ex. 5).

Detective Grubbs testified that Wiley and Mitchell's heights and weights matched those of the robbers. (Tr. 120). Detective Grubbs indicated in his affidavit submitted in support of the search warrant that Defendant Mitchell was suspected to be one of the robbers who had been wearing black Nike shorts, black Nike crew socks, black sneakers, a tan t-shirt, a grey hoodie, a bandana over his face, and latex gloves. (Gov't's Ex. 5).

---

[1] Detective Grubbs indicated in his search warrant affidavit that he observed the two black males and a female walking up the stairs from the lower levels of the parking garage when they were detained. (Gov't's Ex. 5). Detective Grubbs testified, however, that he observed the individuals coming out of a parking garage. (Tr. 119).

At the time police intercepted Mitchell and Wiley, Mitchell was wearing similar clothing, except that he was not wearing a hoodie, a face covering, or latex gloves. (Tr. 120).

Based on surveillance video from the GameStop, the suspect in the video later believed to be Defendant Wiley was wearing a black hoodie, mask, latex gloves, black pants, and orange sneakers, and was carrying a long rifle concealed in a light-colored pillow case. (Tr. 118). When Wiley was intercepted at the parking garage, Wiley was wearing black zipper pants which had zippers in the same locations as those of the suspect in the GameStop video, but the rest of his clothing was different. (Tr. 119-20, 125, 129).

Detective Grubbs indicated in his search warrant affidavit that he had confirmed the identities of Mitchell and Wiley. (Gov't Ex. 5). Grubbs testified that he based his identification of Defendant Wiley on the fact that his height, build, and weight and the zipper pants he was wearing when intercepted by the police matched the suspect believed to be Wiley depicted in the video evidence. (Tr. 118, 128-29). Judge Bennett approved the arrest warrant, and the warrant information was placed in the NCIC system. (Tr. 110, Ex. 5).

### B.   The Atlanta Investigation

David Raissi, who was a Detective with the Cobb County Police Department, became involved in the investigation of Defendants Wiley, Mitchell, and Starling in connection with armed robberies of GameStops in the Cobb County area. (Tr. 7, 143-44). Detective Raissi involved the Violent Incident Prevention and Early Response Unit

6

("VIPER Unit") and Sergeant Darren Hull, who is the Sergeant over the homicide and robbery unit, in the investigation.  (Tr. 7).  Detective Raissi gave Sergeant Hull descriptions of a white Hyundai Sonata and a blue Acura believed to be getaway vehicles in the Cobb County robberies and asked Sergeant Hull to have the VIPER unit locate the vehicles and begin surveillance.  (Tr. 8-10).

Mobile surveillance of the white Hyundai Sonata led the officers to a residence at 2604 Favor Road.  (Tr. 9).  The Officers observed black males exit the residence and make contact with the driver of the Hyundai. (Tr. 26-27).  The men also removed black clothing and a bag out of the car. (Tr. 9-10).  After the Hyundai departed the residence, the officers came back to the residence and the blue Acura they were looking for was there.  (Tr. 9, 26).

The officers also observed a black Mercury, possibly a Milan, parked in a carport area.  (Tr. 10).  The Mercury was believed to be associated with two armed robberies in metro Atlanta, one at a Hibbett Sports in Roswell and one at Windy Hill in Marietta.  (Tr. 11, 172-73).  The Mercury used in the robberies had very specific wheels and rims, and the Mercury parked in the carport matched them.  (Tr. 172-73).  Until this point, officers investigating the robberies did not have tag information for the Mercury. (Tr. 182).  The officers ran the tag on the Mercury and found that it was registered to Torey Starling. (Tr. 173).

After the possible getaway vehicles were observed at the residence, the unit then began conducting electronic surveillance of the residence with a pole-camera. (Tr. 10-11,

7

25).  Based on the video from the pole camera, the officers observed a gentleman wearing skinny jeans with multiple zippers on it and red shoes.  (Tr. 147).  This was significant to Detective Raissi because one of the suspects for a robbery in Marietta wore red high-top shoes and similar pants.  (Tr. 147).

Sergeant Hull and the VIPER unit conducted surveillance operations over three days starting on October 26, 2018.  (Tr. 7-8).  Police surveilled the three cars (white Hyundai, blue Acura, and black Mercury) as well as the residence.  (Tr. 11-12). While the combination of a camera stationed in a nearby sports utility vehicle as well as the pole camera captured a number of different individuals, the police did not know who they were.  (Tr. 167).  The officers obtained a warrant for placement of a GPS tracker on the Hyundai and installed it around midnight on October 26, 2016.  (Tr. 11-12, 27-28).  The Mercury was observed at the residence several times over the three-day surveillance operation.  (Tr. 10).

Detective Raissi obtained a search warrant for the Favor Road residence, which was across the street from a large high school.  (Tr. 34, 175).  Raissi did not mention Defendant Wiley in the search warrant because they did not know he was a suspect at that time.  (Tr. 175-76).  The search warrant was executed on October 28, 2016, around 1:08 p.m.  (Tr. 170, 175).  On that day, the officers began surveillance of the home on Favor Road early in the morning.  (Tr. 35).  The officers observed the occupants of the residence loading up the trunks of their cars as if they were getting ready to leave.  (Tr. 35).  The officers then set up a perimeter around the residence and some of the officers drove a

8

Suburban to the residence, pulled into the driveway, activated their blue lights, chirped their siren, and announced themselves as Cobb County Police Department SWAT team. (Tr. 35).  Sergeant David Reid, the supervisor of the over the tactical team, a unit of the SWAT team, arrived at the residence with four or five other officers.  (Tr. 32-33, 37). Sergeant Reid was wearing a tactical uniform, including a heavy tactical vest with police markings across the middle of it, and a helmet.  (Tr. 32-33, 37).  Sergeant Reid's pistol remained holstered and the other officers were carrying firearms.  (Tr. 36-37).

The officer gave commands to people outside the residence to lay down on the ground.  (Tr. 39).  The police wanted the individuals at the scene to approach them in a slow and steady manner.  (Tr. 38).  One African-American male, later identified as Defendant Starling, complied and got down on the ground.  (Tr. 39, 45-46).  As the law enforcement officers instructed the individuals outside the residence, two African-American males came out of the residence.  (Tr. 36).  One gentleman who exited the residence, later identified as Defendant Mitchell, complied with the officers' instructions to get down on the ground.  (Tr. 39, 170).

The other gentleman exiting the house got down on the ground, but then rose into a track runner's stance.  (Tr. 39, 53-54).  The man, later identified as Defendant Wiley, bolted through the yard towards the high school.  (Tr. 39-40).  Defendant Wiley exited the property at a full sprint and broke through the SWAT perimeter.  (Tr. 14, 16, 40). Officers pursued Defendant Wiley on foot and in an unmarked police car.  (Tr. 14-15). The officers identified themselves as police officers and commanded Defendant Wiley

9

to stop. (Tr. 16, 58). Defendant Wiley ignored the officers' commands and continued to run even after one of the officers utilized their taser on him and he was briefly incapacitated. (Tr. 31, 55). The chase lasted about five minutes. (Tr. 56, 60). Once the officers caught up to Wiley, Wiley resisted, struggled, and tried to get away, but the officers placed him in handcuffs. (Tr. 15, 56, 61). The officers also handcuffed the individuals who complied with their instructions and moved them off to the side of the house, and then into Sergeant Reid's Chevrolet Suburban. (Tr. 40, 43, 47-48). Ultimately, five people were detained: Defendants Starling, Mitchell, and Wiley, Devonne Foster, who was Starling's roommate, and Jasmine, who was Starling's girlfriend. (Tr. 28). None of the individuals at the Favor Road residence had been identified prior to the execution of the search warrant. (Tr. 20).

Because Wiley had run, the officers became concerned that other individuals could escape the perimeter and pose a danger to them from behind or that there could be other dangerous individuals inside the house. (Tr. 42). Nearby Osbourne High School was placed on modified lockdown. (Tr. 41). The officers tried to clear the area and keep it safe. (Tr. 42). They prevented individuals from entering the Favors Road location. (Tr. 43).

Four men from inside the residence and Defendant Starling's brother, who had showed up later, were transported from the residence to police headquarters. (Tr. 29). Starling's brother was detained when he became angry after officers refused his request to speak with his brother. (Tr. 101, 169). The female was not transported. (Tr. 29).

10

Defendant Starling's grandfather also arrived at the Favors Road residence where he demanded to speak with Starling and requested an explanation of what was happening because the Favors Road house belonged to him.  (Tr. 101).

Patrol Officer Stephen DeLoach transported Defendant Starling to the Cobb County Police Headquarters at 1:38 p.m.  (Tr. 96, 103).  Police transported Defendant Mitchell to  headquarters, and Mitchell arrived at approximately 2:10 p.m.  (Tr. 75, 96, 98, 154).  Eventually Defendant Wiley arrived, and Officer DeLoach watched over all three Defendants in the common area.  (Tr. 97).  Officer DeLoach did not have any conversations with the Defendants during this period with the exception that Defendant Wiley discussed a rap video he was supposed to film the next day.  (Tr. 97).

Officers handcuffed Defendant Mitchell's wrist to the arm of a chair in a conference room, and Mitchell watched television while he waited.  (Tr. 99, 154). Mitchell was a suspect at the time, and normally suspects are restrained during transport to the police station.  (Tr. 84).  Defendant Starling was seated next to him.  (Tr. 99). Defendant Wiley was not restrained because he had complained that he was anemic and feeling cold.  (Tr. 99, 154).  Wiley was provided with a blanket.  (Tr. 154).  While Wiley was being held, the officers used the Rapid ID System to identify Wiley's fingerprints. (Tr. 100).  After obtaining Wiley's left thumbprint and his left middle fingerprint on the fingerpad, the system notified the officers that there was an NCIC alert for Wiley's identity and that there was a warrant for Wiley's arrest in Texas.  (Tr. 100).

Around approximately 3:12 p.m., the detectives learned that a Mossberg 22 pistol

11

was located in the Mercury Milan in the carport of the Favor Road residence that matched a firearm from two of the robberies. (Tr. 160). During the interview, Detective Raissi learned that the officers also found Jimmy Jazz bags in the Mercury Milan and in the house, which they believed were used during the robberies. (Tr. 161). Finally, the searching officers found two black ninja-type masks that they believed had been used in a Sandy Springs robbery. (Tr. 161).

### C.   Interview of Defendant Mitchell at Police Headquarters

At about 7:31 p.m., Detectives David Raissi and Michael Selleck moved Mitchell into a room that was approximately 8' by 8' or 4' by 8', and began interviewing him at around 7:31 p.m. (Tr. 63-64, 155-56). The temperature in the interview room was between seventy and seventy-two degrees. (Tr. 157). The interview was recorded, and the recording has been submitted into evidence. (Tr. 158; Gov't Ex. 3). Detective Selleck admits that at the time of the interview with Mitchell, the officers did not know the identity of the robbery suspects. (Tr. 79).

During the interview, Mitchell and Detectives Raissi and Selleck sat around a small table. (Tr. 157). Mitchell's handcuffs had been removed, he was no longer restrained, and neither detective wore their firearms. (Tr. 65, 72, 157, 164; Gov't Ex. 3). Mitchell appeared calm. (Tr. 71, 155). According to Detectives Raissi and Selleck, the tone of the interview was conversational, and the officers did not scream at Mitchell or physically touch him during the interview, other than to obtain his fingerprints on the Rapid ID System. (Tr. 72, 161-62). Detectives Raissi and Selleck testified that they neither

12

threatened Mitchell nor made promises to him during the interview.  (Tr. 72, 163).
Mitchell never raised his voice during the interview or asked for an attorney.  (Tr. 72,
164; Gov't Ex. 3).

Initially, an unidentified law enforcement officer asked Mitchell for his name, birth
date, his age, and his social security number.  Mitchell told the law enforcement officer
that his name was Gerald Smith, gave him the birthday February 29, 1994, but explained
that he did not know his social security number and did not have any identification.  The
officer then asked Defendant how he bought tobacco products or alcohol.  (Gov't Ex.
3, at 0:10-0:12).  Mitchell denied buying tobacco products and drinking alcohol.  (Id.).
When the officer asked Defendant what was his address in Texas, Mitchell claimed not
to know it.  (Gov't Ex. 3, at 0:12).  The officer then asked Mitchell his mother's name,
address, phone number, and birthday, who he lived with when he was in Texas, his
grandfather's address and age, whether Mitchell had any siblings, as well as his sister's
age, birthday, and where she stayed.  (Gov't Ex. 3, at 0:12-0:14).

Detective Selleck then took over the questioning.  Detective Selleck asked Mitchell
whether he had ever been in trouble and whether there were any warrants for his arrest,
and Mitchell replied that there was not.  (Gov't Ex. 3, at 0:14).  Detective Selleck
inquired whether Mitchell's last name was really Smith, and Mitchell admitted that his
last name was Mitchell.  (Gov't Ex. 3, at 0:14).  Detective Selleck questioned whether
Mitchell's birthday was really the day that Mitchell had previously given and pressed that
February 29, 1994, did not exist because 1994 was not a leap year.  (Tr. Gov't Ex. 3,

13

at 0:14-0:15).  In response, Mitchell admitted that his birthday was February 4, 1994.

(Gov't Ex. 3, at 0:15).  Detective Selleck then insisted that Mitchell had to be honest

with him and that if he was not, the detectives would find out eventually.  (Id.).  Detective

Selleck further advised Mitchell that they were trying to get out of there as much as

Mitchell was trying to get out of there.  (Gov't Ex. 3, at 0:15).            Detective Selleck

next introduced himself and Detective Raissi to Mitchell.  (15:30).  Detective Selleck told

him that they were going to get some personal information from Mitchell, claiming that

Mitchell had given him "a load of shit."  (Gov't Ex. 3, at 0:16-0:17).  Detective Selleck

asked Mitchell had he been in trouble, and Mitchell denied that he had.  (Gov't Ex. 3,

at 0:16).  Detective Selleck then confirmed Mitchell's name and birthday.  (Gov't Ex.

3, at 0:16-0:17).  Detective Selleck requested Mitchell's phone number, but Mitchell

asserted that he did not have one.  (Id.).  Detective Selleck also asked Mitchell why

people call him Gerald.  (Gov't Ex. 3, at 0:17).  Mitchell then volunteered that he was

not close with his biological family because he found that they were not supportive of

him after he graduated from high school.  (Gov't Ex. 3, at 0:17).  Detective Selleck

asked Defendant if he grew up in Texas or Oklahoma, and Mitchell indicated that he grew

up in Texas.  (Gov't Ex. 3, at 0:17-0:18).  Detective Selleck then asked for Mitchell's

permanent address where he grew up, and Mitchell responded with an address in Katy,

Texas.  (Id.).  Selleck asked Mitchell how long he had been in Georgia, and Mitchell

responded, "About a month."  (Gov't Ex. 3, at 0:18).  Detective Selleck asked Mitchell

where he was staying in Georgia, and Mitchell indicated that he had been staying with

14

his uncle in Atlanta for the first few days he was in the area, and then had stayed in some hotels.  (Gov't's Ex. 3, at 0:18-0:19).  Detective Selleck asked Mitchell for his uncle's last name, and Mitchell claimed that he did not know it.  (Gov't's Ex. 3, at 0:18-0:19).

Detective Selleck next asked Mitchell whether he had ever had <u>Miranda</u> warnings read to him, his highest level of education, whether he was intoxicated, and whether he spoke English.  (Gov't's Ex. 3, at 0:19-0:20).  Selleck advised Mitchell of his <u>Miranda</u> rights around 7:37 p.m.  (Gov't's Ex. 3, at 0:20-0:22, Ex. 4; Tr. 66, 68, 70-72, 165).  Following the <u>Miranda</u> warnings, Detective Selleck asked Defendant Mitchell if he wanted to speak with him and Detective Raissi, and Defendant responded, "Sure, so I can get out of here.  I don't even know what's going on."  (Gov't's Ex. 3, at 0:21-0:22).  Detective Selleck then handed Mitchell a waiver of rights form, explained the form, and Mitchell signed the form.  (Gov't's Ex. 3, at 0:22).  Detective Selleck then told Mitchell he had to stop lying to police, and Mitchell assented.  (<u>Id.</u>).

Detective Selleck then questioned Mitchell for almost two hours devoted to uncovering his activities in Atlanta and facts implicating him and his co-defendants in the robberies. During the course of the questioning, the detectives obtained numerous admissions connecting Mitchell to the robberies, such as when Mitchell came to Atlanta and his whereabouts while in Atlanta, potential motives to engage in the thefts, Mitchell's association with his co-defendants and their presence at the Favors Road residence, and information about Mitchell's co-defendants and some information connecting Mitchell and his co-defendants to the robberies.  (<u>See generally</u> Gov't's Ex. 3).  As part of the

15

detectives' attempt to induce Mitchell to provide a statement, they repeatedly suggested that his situation was very precarious, he was in the middle of an armed robbery investigation, and his situation was as bad as it could get.  (Gov't's Ex. 3, at 0:42, 0:48, 1:36; 1:45, 1:54).   After Defendant Mitchell denied responsibility, the detectives repeatedly urged him to be honest, insisted that honesty could not hurt him, and implied that if he was honest and told them the whole story, it was possible that he may get to return home after the detectives assessed the information Defendant supplied.  (Gov't's Ex. 3, at 48:35, 49:00, 1:51, 1:53).  For instance, Detective Raissi told Defendant after approximately and hour and a half, "[I]f you tell us the truth and cooperate, it's only going to help you in the long run," "You can't go anywhere but better from here, if you cooperate" and that it "can't go worse," and "it can only get better if you cooperate." (Gov't's Ex. 3, at 1:35-1:36).  While the detectives did indicate that they could not promise Mitchell anything, they also advised that Mitchell's cooperation could only help. (Gov't's Ex. 3, at 1:36).  One of their conversations went as follows:

> Raissi:    What happens from here is totally up to you.  It really is.  It's totally up to you.  Because if you tell us the truth and cooperate, it's going to help you in the long run.
>
> Defendant:  Like how?
>
> Raissi:    There's a million different ways it can help.   With the prosecutor's discretion.  The uh . . .
>
> Defendant:  So, am I being arrested?
>
> Selleck:   You're detained right now.  You're in the middle of an armed robbery investigation.

16

Raissi: Correct. So what you do now and what goes on, it can absolutely change everything for the better for you. You can't go anywhere but better from here if you cooperate.

Selleck: (Laughing). You can't go anywhere from better.

Raissi: Exactly. It can't go worse.

Selleck: It can't go worse.

Raissi: It can't go worse.

Selleck: It can't go worse. It's about as worse as you can get right now. I'm telling you this is bad.

Raissi: It can only get better from here.

Selleck: This is what I've been trying to tell you the whole time, man. Maybe you weren't getting it. Maybe I wasn't explaining it right to you. You are in the midst of an armed robbery investigation. You are detained right now.

Raissi: It can only get better if you cooperate.

Selleck: That's why I'm telling you. I'm throwing the lifeline. Okay. So is he. We know your minimal sum. We know you're involved. Okay? You've got to tell me. I can't promise you anything. I can't give you any deals. I can't do anything like that.

Raissi: *But it can only help*.

Selleck: But I can tell you this. Where you're at right now. It ain't good.

Defendant: Uh, this is terrible.

Selleck: This is your opportunity. I need you to tell me what's going on. Wednesday. Let's talk about Wednesday.

(Gov't's Ex. 3, at 1:35-1:36).

17

The detectives' repeated strategy was to persuade Defendant Mitchell to make incriminating statements and appealed to the notion that he was scared, he was in a very bad situation, he should not let his colleagues hurt his future, and the only lifeline that could help him was to tell them the truth. (Gov't's Ex. 3, at 0:28, 0:56-0:59, 1:35-1:36). The detectives pushed their strategy hard, often telling Defendant Mitchell that they were throwing him a lifeline, threatening that the window of opportunity was closing, telling him that the only thing that could help them was to tell them what was going on, and threatening that they were going to close the interrogation. (Gov't's Ex. 3, at 0:57-0:59; 1:02, 1:09-1:10, 1:35, 1:45-1:48, 1:54). At one point, Detective Selleck raised his voice at Defendant Mitchell, told Mitchell that he was implicated in a serious armed robbery, and threatened to walk out. (Gov't's Ex. 3, at 1:47). Throughout the questioning, Mitchell often rubbed the hair at the top of his head, lowered his head, or placed his head on the table or in his hands. (See, e.g., Gov't's Ex. 3, at 1:54). After more than an hour of questioning, Mitchell complained that he not want the detectives to talk to him all day and that he wanted to go home. (Gov't's Ex. 3, at 1:20). Detective Raissi, however, testified that Mitchell was not free to leave because they had probable cause for his arrest. (Tr. 165). By this point, the officers had learned that Defendant Mitchell had given them a false name and birthday, and had received information about some of the items recovered from the search of the Favor Road residence. (Tr. 165). At some point during the interview, the detectives also learned of the outstanding Dallas, Texas warrant for Defendant Mitchell's arrest. (Tr. 74). After the interviews, Officer DeLoach transported

18

Mitchell and Wiley to the jail.  (Tr. 104).  Upon booking, a gold grill and some shoe laces were taken from Defendant Mitchell.  (Tr. 172).

### D. Detective Raissi Obtains a Search Warrant for Photographs of Defendant Wiley's Tattoos

Following the execution of the search warrant at the Favor's Road residence and the arrests of the Defendants, Detective Raissi obtained another search warrant, dated November 1, 2016, from Cobb County Magistrate Judge Don Hicks.  (Gov't's Ex. 5a). The warrant permitted Detective Raissi to obtain photographs of the tattoos on Defendant Wiley's body.  (Id.).  In order to persuade Judge Hicks to issue the warrant, Detective Raissi relied upon evidence obtained during the search of the Favors Road residence as well as evidence obtained during the course of the investigation of the Texas robberies. Detective Raissi explained in the warrant application that Wiley was suspected of armed robbery in violation of O.C.G.A. § 16-8-41, aggravated assault with a deadly weapon in violation of O.C.G.A. § 16-5-21, and violation of the Georgia Gang Statute  (O.C.G.A. § 16-15-4).  Detective Raissi stated to Judge Hicks that he believed Wiley was involved in seven robberies, four of which occurred in Cobb County, Georgia.  (Gov't's Ex. 5). Detective Raissi described the robberies in his affidavit and detailed common threads between each of the robberies, such as the type of weapon used, the clothing worn by the robbers, the getaway vehicles used, and the method of controlling the victims.  Detective Raissi also offered the following information connecting Wiley to the robberies in support of his application for a warrant:  (1) police officers in Dallas, Texas made a

19

positive identification of Wiley in connection with the September 2016 armed robbery of a GameStop and obtained a warrant for his arrest; (2) during the Dallas robbery, a GameStop employee placed a tracker in a bag of money given to the robbers, the Dallas Police Department followed the tracker signal inside a parking garage and found a car, registered to Defendant Mitchell, with a gun in it, and although there were noone in the vehicle, the officers then found Wiley and Mitchell inside a stairwell in the parking garage and obtained a positive ID of Wiley and Mitchell; (3) the female owner of a white Hyundai Sonata believed to be used in a September 27, 2016 armed robbery of a Hibbett Sports Store in Marietta, Georgia, and a October 15, 2016 armed robbery of a GameStop, stated that she let Wiley borrow her car; (4) in the September 27, 2016 armed robbery of the Hibbett Sports Store, the robbers used a silver handgun and wore black face coverings and red shoes, and the robbers instructed the victims to count to 100 before getting up; (5) in the October 15, 2016 robbery of the GameStop, a male suspect wearing some type of facial covering robbed the store with a large firearm, ordered the occupants of the store to count to 100 before departing in a white Hyundai Sonata, for which a customer recorded the tag number; (6) police located the white Hyundai Sonata and followed it to the Favors Road location; (7) police observed vehicles at the Favors Road location which were similar to the description of other vehicles utilized in other recent armed robberies of GameStops and Hibbetts Sports Stores in the northwest metro Atlanta area where robbers wore similar clothing and/or used similar methodologies and weapons; (8) during the execution of the search warrant of the Favors Road residence, police located firearms,

20

black masks, and clothing believed to be used in the robberies as well as clothing Wiley was wearing when the Dallas Police Department stopped him in Texas; (9) during the execution of the search warrant at the Favors Road location, Wiley fled on foot and was apprehended; and (10) Co-Defendant Mitchell admitted to waiting in the getaway car, a 2011 Hyundai Sonata, while others committed the September 27, 2016 robbery of a Hibbett Sports Store.  (Gov't Ex. 5a).

Detective Raissi also averred that he saw a tattoo of a five-pointed star on Wiley's neck and learned from Wiley's booking information that MOB was tattooed on Wiley's chest.  (Gov't Ex. 5a).  Raissi opined that based on his training and experience, both tattoos were associated with membership in the Bloods street gang.  (Gov't Ex. 5, 5a).  According to Detective Raissi, in 2011, Wiley was also identified as a member of the Get Money Squad, a local Marietta criminal street gang which was known for among other things, aggravated assault, aggravated battery, and thefts.  (Gov't Ex. 5a).

## II.    LEGAL ANALYSIS

Defendant Mitchell contends that he was unlawfully arrested without a warrant and without probable cause when law enforcement officers restrained him during the search of the Favors Road residence, transported him to the police station, held him for six hours, and then interrogated him.  Mitchell also contends that statements made during his interrogation and any evidence obtained from the search of his person should be suppressed as the product of his illegal arrest.  Mitchell further contends that Detectives Raissi and Selleck's interrogation was coercive because they continued their questioning

21

after concluding that he was lying to them about his identity before giving him his Miranda warnings, and relied on deception and implied promises to elicit testimony after giving Miranda warnings.  The Government argues in response that Mitchell's detention was reasonable under the circumstances because surveillance of the house had revealed that cars linked to robberies frequented the Favors Road residence, black males had been seen interacting with the vehicles, and surveillance footage from the stores that were robbed was consistent with the clothing worn by two black males at the residence.  The Government also maintains that law enforcement was permitted to interview and investigate the individuals inhabiting the house targeted by the search warrant because such an investigation is a natural consequence of executing a search warrant.  The Government further contends that Mitchell's detention was justified at its inception because Mitchell was an occupant of the Favors Road residence.  The Government argues that it was proper for the officers to transport Mitchell to the police station upon executing the search warrant because the situation became too chaotic for law enforcement to properly interview the various suspects at the scene of the property.  In support, the Government points out that Wiley had fled, various third parties, some belligerent, had descended upon the scene, and the high school across the street had gone into lockdown.  As a result, the scene had become unstable and potentially dangerous, and it was reasonable to transport Defendant Mitchell to the police station and detain him there.

**A.    The Transport of Defendant Mitchell to Police Headquarters Was Not Justified By the Summers Exception for Execution of a Search Warrant**

The Fourth Amendment of the United States Constitution protects the right to be free from unreasonable searches and seizures.  United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003).  "A seizure occurs for Fourth Amendment purposes, . . . only when, by means of physical force or a show of authority, [a person's] freedom of movement is restrained."   United States v. Perez, 443 F.3d 772, 778 (11th Cir. 2006).   When determining whether there has been such a show of authority, factors to be considered include:

> Whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education, and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.

Perez, 443 F.3d at 778 (citing United States v. De La Rosa, 922 F.2d 675, 678 (11th Cir. 1991)); see also United States v. Cusick, 559 F. App'x 790, 791 (11th Cir. 2014).  Other factors include the extent to which the officers physically restrained the individual, the officers' demeanor, and whether the officers impeded the suspect's progress.  United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989).  The Government does not dispute that Defendant Mitchell was detained as part of the execution of the search warrant when he was handcuffed and moved to the side of the house.  (Tr. 40; Gov't's Br., Doc. 125, at 10).  The Government contends, however, that law enforcement officers had reasonable suspicion to place Mitchell under investigatory detention because

23

surveillance had revealed that cars linked to robberies had frequented the Favors Road house, black males had been seen interacting with the vehicles during that time, and the clothing worn by two black males there was consistent with the clothing of the robbers depicted in the video footage of the robberies.

Specifically, the Government argues that Mitchell's investigatory detention was justified at its inception because Mitchell was present at the residence during the execution of the warrant and the reason for detaining him related to the reason for the warrant.  While Mitchell concedes that the initial police detention of him at the Favors Road residence was justified under the Summers exception, Mitchell argues his subsequent transport to police headquarters ripened the detention into a full scale arrest. (See Def.'s Reply, Doc. 131, at 9 ("And while it would have been permissible to temporarily detain Mr. Mitchell without reasonable suspicion to facilitate the execution of the search warrant, the Government's reason – to interrogate Mr. Mitchell – falls well outside the limited purposes of such a detention).

The United States Supreme Court, in Michigan v. Summers, 452 U.S. 692 (1981), determined that a warrant to search a residence for contraband justified by probable cause "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is being conducted." Summers, 452 U.S. at 705.  In Summers, as police were about to execute a search warrant of a house for narcotics, they encountered the defendant descending the front steps. Summers, 452 U.S. at 693.  The police detained

24

the defendant while they searched the premises and obtained his help in gaining entry into the house.  Id.  The Court reasoned that the detention's incremental intrusion on personal liberty and privacy was warranted since the search of a home had already been authorized by a judicial officer who authorized the police to thrust themselves into the privacy of that home after determining that police have probable cause to believe someone in the home was committing a crime.  Summers, 452 U.S. at 703-04.  The Court opined that an occupant's connection to the home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.  Summers, 452 U.S. at 703-04.  Furthermore, the Court reasoned that the detention of residents while the premises are searched, although admittedly a restraint of the resident's liberty, was less intrusive than the search itself and that most citizens would elect to remain in order to observe the search of their possessions.  Summers, 452 U.S. at 701-02.  Importantly, the Court considered the fact that "the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention."  Summers, 452 U.S. at 701-02.  The Court also pointed out that the detention was in the detainee's own residence and thus, would add only minimally to the public stigma associated with the search itself and "would involve neither the inconvenience or the indignity associated with a compelled visit to the police station."  Summers, 452 U.S. at 701-02.  The Court concluded that such detentions are

justified on the grounds of officer safety, facilitating the completion of a search, and preventing flight.  Bailey v. United States, 568 U.S. 186, 194 (2013) (citing Summers, 452 U.S. at 702-03).

The Summers exception has been treated as a broad, categorical rule in the Eleventh Circuit.  Gomez v. United States, 601 F. App'x 841, 846-47 (11th Cir. 2015); Sampson v. City of Brunswick, 549 F. App'x 858, 860 (11th Cir. 2013) (explaining that the Supreme Court has held "that police officers have a 'categorical' right to detain occupants of a premises while executing a search warrant for contraband"); Wayne R. LaFave, 2 Search and Seizure: A Treatise on the Fourth Amendment § 4.9(e) (5th ed. 2018) (explaining that the standardized procedure permitted by Summers allows police to always detain persons found at the premises named in a search warrant for the search of contraband provided the persons detained are occupants).  It does not require that law enforcement have particular suspicion that the individual is involved in criminal activity or poses a danger to officers.  Muehler v. Mena, 544 U.S. 93, 98 (2005) (explaining that detentions of occupants present in home during search does not depend on the quantum of proof justifying detention, or the extent of the intrusion to imposed by the seizure); Gomez, 601 F. App'x at 847.  The duration of such a detention extends for the whole length of most warranted searches.  Croom v. Balkwill, 645 F.3d 1240, 1250 (11th Cir. 2011); see also Mena, 544 U.S. at 98 (three-hour detention of handcuffed innocent bystander deemed plainly permissible).  Even a six-hour detention has been countenanced

26

under the Summers exception.  Sampson, 549 F. App'x at 860-61.

   That being said, however, the Summers exception has not been extended to a situation where, as in this case, Mitchell was transported from the location of the search to the police station, held handcuffed to a desk for six or more hours, and then interrogated well beyond the conclusion of the search for more than two hours.  Indeed, the Supreme Court's reasoning allowing the exception in Summers is not applicable to such cases or the instant case.  For instance, while the Supreme Court in Summers relied on the fact that the detention at the scene was not likely to be exploited by the officer or unduly prolonged in order to gain more information, Mitchell's prolonged detention, lasting eight hours or more and punctuated by the over two-hour interrogation, was exploited by the police to gain more information.  Summers, 452 U.S. at 701-02.  Here, unlike the facts evaluated in Summers, it is clear that the lengthy investigation at the police station was based on the intent to interrogate Mitchell and the other individuals present at the Favors Road residence.  (See Gov't's Br., Doc. 125, at 14 (admitting that "[i]n this case, the purpose of the detention was the follow up on the valid search warrant that was executed by interviewing and further investigating the suspects present inside the target home" and that the search of the house was ongoing for a portion of the time Mitchell was detained at the police station).  Moreover, while the Supreme Court in Summers relied on the fact that the detention would not involve the "inconvenience or the indignity associated with a compelled visit to the police station," Mitchell

experienced the indignity of being held in handcuffs in the yard, being physically transported to the police station, and then being held for a five or more hour period handcuffed to the arm of a chair before being questioned.  (Tr. 99, 154); Summers, 452 U.S. at 701-02; see also Bailey, 568 U.S. at 200 (explaining that when officers arrest an individual away from his home, there is an additional level of intrusiveness and that detention beyond the immediate vicinity can involve the additional indignity of a compelled transfer back to the premises giving the appearances of an arrest, and that "[a] spacial constraint defined by the immediate vicinity of the premises to be searched is therefore required for detentions incident to the execution of a search warrant"). Although the Court appreciates the need for officers to be in command of the situation for officer safety, this Court is not persuaded that officer safety could not be accomplished if Mitchell were detained at the scene instead being transported to the police station and interrogated.  Bailey, 568 U.S. at 194.  Indeed, Mitchell was compliant with the police officers' instructions and had already been handcuffed and placed in a Suburban at the time he was transported to the police station.  (Tr. 39, 43, 47-48, 170). Moreover, there were approximately twenty armed officers at the scene.  (Tr. 21).  Under these circumstances, the Summers exception did not apply, and the detention of Mitchell ripened into a full arrest which could only be justified by probable cause.  See Hayes v. Florida, 470 U.S. 811, 815-16 (1985) (explaining that police seizures become so intrusive as to be equivalent to an arrest for purposes of the Fourth Amendment where "the police,

28

without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes"); Dunaway v. New York, 442 U.S. 200, 216-17 (1979) (holding that police officers violated the Fourth Amendment when they seized defendant from a neighbor's house and transported him to the police station for interrogation without probable cause); Leveto v. Lapina, 258 F.3d 156, 169-70 (3d Cir. 2001) (holding that Summers exception did not apply where IRS agents detained defendant for eight hours, only permitted him supervised visits to the restroom, restricted him from communicating with others, and required him to ride with the agents to his home and then back to his office); Agee v. White, 809 F.2d 1487, 1490-91 (11th Cir. 1987) (explaining that there was little difficulty in concluding that the seizure of defendant was illegal and indistinguishable from traditional arrest where officers confronted defendant at his workplace with guns drawn, transported him to the police station, and held him in a locked room for three hours prior to questioning without probable cause for an arrest ); Simmons v. City of Chicago, No. 14 C 9087, 2017 WL 497755, at *8 (N.D. Ill. Feb. 7, 2017); Fontana v. City of Fed. Way, No. C11-998 RAJ, 2013 WL 12066144, at *11-12 (W.D. Wash. Sept. 25, 2013).

### B.   The Transport of Defendant Mitchell to Police Headquarters Was Not Justified By Probable Cause for an Arrest

In this case, Mitchell's arrest and transportation to the police headquarters was illegal and done without probable cause.  Probable cause exists when "the facts and

29

circumstances within the officers' knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Miller v. Harget, 458 F.3d 1251, 1259 (11th Cir. 2006), cert. denied, 127 S.Ct. 2429 (2007).  Additionally, law enforcement officials "may draw  inferences based on [their] own experience in deciding whether probable cause exists." Ornelas v. United States, 517 U.S. 690, 700 (1996).  Probable cause must not be judged with clinical detachment, but with a common sense view to the realities of normal life.  Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir. 1997).

Here, the Government fails to make a showing that the facts known to the police officers at the time of Defendant Mitchell's transport to police headquarters provided probable cause for his arrest.  Although the police had connected the Favor's Road residence to evidence of the robberies, such as the presence of suspected getaway cars and men garbed in clothes similar to those worn by the robbery suspects, the police had not yet identified Defendant Mitchell at the time of his arrest, and they did not know whether he was connected to the robberies.  (Tr. 20, 54, 79, 147 (at the time of the interview with Mitchell, the officers did not know the identity of the robbery suspects), 167, 172-73, 176-77).  The fact that Defendant Wiley bolted at the time the police were attempting to detain the persons present at the residence did not provide probable cause for Mitchell's arrest.  A persons's mere propinquity to others suspected of criminal

30

activity does not, without more, give rise to probable cause to arrest that person.  Ybarra v. Illinois, 444 U.S. 85, 91 (1979) (holding that police's pat down search of tavern patron was not constitutionally permissible even though police had connected bar to illegal drug activity and had obtained search warrant to search tavern and bartender for narcotics). As the Supreme Court has made clear:

> Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.

Ybarra, 444 U.S. at 91.  Although the police had observed Mitchell present at the residence and at some point suspected that he would stay at the residence for a couple of nights but would also stay in hotels as well,[2] the Government has not presented any evidence that connects Mitchell with the getaway vehicles or any evidence of criminal activity seen at the residence during the surveillance period.  (Tr. 182).  While police observed African-American men exit the residence, make contact with the driver of the white Hyundai, and remove black-in-color clothing and a bag out of the Hyundai, there was no indication that the police identified Mitchell as being either the driver of the Hyundai, or the individuals from the residence removing clothing or a bag from the

---

[2] The Government presents no evidence that the police knew or suspected that Mitchell stayed in the residence two days a week by the time of his arrest.  Given that surveillance had only occurred for three days or less and the police had not identified anyone at the residence prior to the search, it is unlikely that the police learned that Mitchell stayed in the residence for two days per week by the time of the arrest.

Hyundai.  (Tr. 9-10, 26-27).  Likewise, although the officers, during surveillance of the residence, observed a man wearing skinny jeans with multiple zippers and red shoes and believed that this clothing was similar to that worn by the robbery suspects, the police did not identify this person as Mitchell.  (Tr. 147).  Thus, Mitchell's mere presence at the residence where potential evidence of a crime was present is not enough to establish probable cause for his arrest.  (Tr. 42).  See, e.g., Holmes v. Kucynda, 321 F.3d 1069, 1079-81 (11th Cir. 2003) (holding that presence of cocaine in apartment did not establish probable cause for arrest of overnight guest staying at apartment because there had to be some nexus between the overnight guest and the cocaine and there was no basis for believing that overnight guest had constructive possession over cocaine); Urbanique Prod. v. City of Montgomery, 428 F. Supp. 2d 1193, 1211 (M.D. Ala. Mar. 28, 2006) (explaining that the fact that there was probable cause to search residence did not automatically supply probable cause for resident's arrest where officer did not know facts about identity of the resident, did not know whether resident was a resident or a mere visitor, and did not connect resident to any role in drug transactions at the residence); Sims ex rel. Sims v. Forehand, 112 F. Supp. 2d 1260, 1270-73 (M.D. Ala. 2000) (noting that whether individual was friends with other occupants of the home or person who was named in warrant for search of home said nothing as to whether individual possessed contraband).  Because the Government falls short of showing that the police had any knowledge of any connection between Mitchell and the robberies at the time Mitchell was

AO 72A
(Rev.8/82)

taken into custody and transported to the police station, the Government has not established that there was probable cause for Mitchell's arrest.

**C.    The Taint of Defendant Mitchell's Unlawful Arrest Was Not Dissipated Prior to His Confession**

The Government contends that even if Defendant Mitchell was illegally arrested, the statements he made during his Mirandized interview should be admissible because there was sufficient attenuation to break the causal chain.  In support, the Government argues Mitchell's confession was purged of the taint of his illegal arrest because the confession did not occur until several hours after the arrest and over that time period, Mitchell was offered snacks.  Additionally, the Government also points out that during the period of arrest, additional evidence was discovered in the Favors Road residence linking the house to the robberies and the police discovered that Mitchell had an outstanding arrest warrant from Texas for a robbery.

A confession resulting from custodial interrogation following an illegal arrest must be excluded from evidence unless "intervening events break the casual connection" between the confession and the illegal arrest so that the confession is sufficiently an act of free will to purge the primary taint.  Taylor v. Alabama, 457 U.S. 687 (1982).  The fact that a confession was voluntary for purposes of the Fifth Amendment in the sense that Miranda warnings were given and understood, is not sufficient by itself to purge the taint of the illegal arrest; voluntariness is merely a threshold requirement.  Taylor, 457 U.S. 687, 690 (1982); Brown v. Illinois, 422 U.S. 590, 601-03 (1975) (explaining that Miranda

33

warnings by themselves are not sufficient to attenuate the taint of an unconstitutional arrest). "Although Miranda warnings do not per se remove the scourge of an unlawful arrest, they 'are an important factor . . . in determining whether the confession is obtained by exploitation of an illegal arrest'" and tend to support attenuation. McDaniel v. Polley, 847 F.3d 887, 894 (7th Cir. 2017) (citing Brown, 422 U.S. at 603). The factors that the court should consider in determining whether the taint has been purged are: (1) the temporal proximity of the arrest and the confession; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. Taylor, 457 U.S. at 690; Brown, 422 U.S. at 603-04.

      1.    Intervening Circumstances Did Not Break the Causal Connection Between Defendant Mitchell's Illegal Arrest and His Confession

        a.    *The Discovery of Evidence of the Robbery at the Favors Road Residence Was Not an Intervening Event that Broke the Causal Connection*

The Government contends that the law enforcement officers' discovery of the firearms and Jimmy Jazz bags in the Favors Road residence during the execution of the search warrant and the discovery that Mitchell had an outstanding arrest warrant from Dallas, Texas, for robbery were intervening circumstances between Mitchell's illegal arrest and the confession. The presence of significant intervening circumstances or attenuation have been found in the following circumstances: (1) where the defendant was released from custody on his own recognizance; (2) where the defendant is permitted to speak with counsel before making a statement; (3) where the defendant is presented

34

before a magistrate for a determination of probable cause prior to making a confession; (4) police develop probable cause to arrest defendant through independent evidence not derived from their unlawful conduct or defendant is subsequently convicted on unrelated charges; (5) where days have passed in between the illegal arrest and the confession; or (6) defendant volunteered the statement.  Parker v. Allen, 565 F.3d 1258, 1292 (11th Cir. 2009); United States v. Tello-Lopez, No. CR417-221, 2018 WL 3827404, at *6-7 (S.D. Ga. June 20, 2018).

Here, the discovery of evidence of the robberies in the Favors Road home is not enough of an intervening circumstance to support a finding that the arrest and confession were attenuated.  As noted above, Defendant Mitchell's mere presence at the residence where potential evidence of a crime was present is not enough to establish probable cause for his arrest and thus, is not enough to create special circumstance.  See, e.g., Holmes, 321 F.3d at 1079-81; Urbanique Prod., 428 F. Supp. 2d at 1211; Sims ex rel. Sims, 112 F. Supp. 2d at 1270-73.

b.   *The Discovery of the Outstanding Warrant for Mitchell's Arrest Was Not an Intervening Circumstance*

It is true that the discovery of an outstanding warrant for the defendant's arrest does normally constitute an intervening circumstance.  The existence of a valid warrant favors the finding that the connection between the unlawful conduct and the discovery of evidence is sufficiently attenuated to dissipate the taint.  Utah v. Strieff, — U.S. —, 136 S. Ct. 2056, 2062-63 (2016) (citing Segura v. United States, 468 U.S. 796 (1984)).

35

A warrant is a judicial mandate to an officer . . . to make an arrest and the officer has a sworn duty to carry out its provisions.  Strieff, 136 S. Ct. at 2062.

But in this case, however, the police would not have discovered the outstanding warrants without unlawfully arresting Mitchell and bringing him to headquarters to discover more information about him.  Only when the officers started interviewing Mitchell at headquarters were the officers were able to learn his identity.  (Tr. 68-69 (indicating that the officers thought Mitchell's last name was Smith because that is the name that Mitchell initially gave them during the interview at the headquarters and that the officers confronted him about his name and his date of birth in order to ascertain his identity), 74 (indicating that the officers learned of the outstanding Texas warrant for Mitchell's arrest while they were interviewing him), 79 (explaining that at the time Mitchell was interviewed, the officers did not know the identity of the robbery suspects)).  At the police station, the detectives exploited Mitchell's illegal arrest by pressing Mitchell about whether he gave truthful information about his identify and his birth date without Mirandizing him even though he was in custody and was not free to leave.  (Tr. 79 (Detective Selleck testified that Mitchell was untruthful when he initially identified himself and he "got [Mitchell] to tell [Selleck] who he was," but still did not Mirandize him and continued to collect data), 86 (indicating that Mitchell was not allowed to come and go as he pleased and the door of the interview room was locked)); Taylor, 457 U.S. at 692-93 (explaining that warrant obtained after petitioner had been arrested and while

36

he was being interrogated was not a significant intervening event because the warrant was obtained based on fingerprints which were obtained as a result of petitioner's illegal arrest); United States v. Wells, 690 F. App'x 338, 345 (6th Cir. 2017) (observing that there is no categorical rule that probable cause for a subsequent arrest purges the taint of an unlawful initial arrest); United States v. Williams, 615 F.3d 657, 669-70 (6th Cir. 2010) (explaining that defendant's admission that he thought there was an outstanding warrant for his arrest made in response to police questioning during unlawful detention was not an intervening circumstance that purged his subsequent adverse statements of taint because officer obtained admission by asking defendant a question during an illegal encounter in which a reasonable person would not feel free to leave or to refuse to answer questions); United States v. Marshall, No. 07-CR-153, 2008 WL 153528, at *10 (E.D. Wis. Jan. 14, 2008) (explaining that discovery of outstanding arrest warrants after search of vehicle did not dissipate taint).

Once at the police station, the officers basically investigated Mitchell's identity and birthday in order to uncover deception regarding his original answers to such questions without first administering Miranda warnings. Although such questioning can be permitted under the booking exception, nothing within the record up to the point of the questioning provides probable cause for an arrest, and even if there was a basis for arresting Mitchell, the questioning was not routine; it was investigatory. Express questioning, when it is not likely to elicit an incriminating response, might not be

considered interrogation as contemplated by the Court in Miranda.  In this vein, law enforcement questions pursuant to routine booking procedures have not been considered interrogation within the meaning of Miranda where they are not intended to elicit information for investigatory purposes.  Pennsylvania v. Muniz, 496 U.S. 582, 600-01 (1990).  Under the routine booking exception, routine booking questions, such as those regarding a defendant's age, height, weight, eye color, name, and current address, are "reasonably related to the police's administrative concerns," and therefore exempt from Miranda's reach.  Muniz, 496 U.S. at 601; United States v. Pacheco-Lopez, 531 F.3d 420, 423-24 (6th Cir. 2008) (explaining that Miranda warnings are not required for questions reasonably related to the police's administrative concerns, such a defendant's name, address, height, weight, eye color, date of birth, and current address); United States v. Muhammad, 196 F. App'x 882, 884 (11th Cir. 2006); United States v. Sweeting, 933 F.2d 962, 965 (11th Cir. 1991) ("An officer's request for routine information for booking purposes is not an interrogation under Miranda, even though that information turns out to be incriminating.").

Questions that are reasonably likely to elicit an incriminating response, however, may breach the booking exception.  United States v. Glen-Archila, 677 F.2d 809, 816 n.18 (11th Cir. 1982) (reiterating that police may not use routine biographical questioning as a guise for obtaining incriminating information and that even questions that are usually routine "must be proceeded by Miranda warnings if they are intended to produce answers

38

that are incriminating"); <u>United States v. Corey</u>, 861 F. Supp. 2d 1341, 1344 (S.D. Fla. 2012) (citing <u>Muniz</u>, 496 U.S. at 602 n.14), <u>aff'd,</u> 521 F. App'x. 759 (11th Cir. 2013). An incriminating response is defined as "any response–whether inculpatory or exculpatory–that the prosecution may seek to introduce at trial." <u>United States v. Lopez-Garcia</u>, 565 F.3d 1306, 1316-17 (11th Cir. 2009).  While routine biographical questions about a suspect's identity are not typically considered interrogation, such questions are interrogation when they are designed to elicit an incriminating response.  In this case, the officers' continued questioning regarding Mitchell's identity, birth date, and identification became interrogation.   Though it may have been constitutionally permissible for the officers to ask Mitchell for his full name, birth date, and identification under the booking exception, the officers' subsequent follow up questions about his name, his birth date, whether he smokes or drinks, how he buys tobacco products (without identification) were designed to catch Mitchell in deception about previously given answers or spur Mitchell to correct the deception, and thus, the questioning became investigatory.  See <u>United States v. Virgen-Moreno</u>, 265 F.3d 276, 294 (5th Cir. 2001) (explaining that where agents asked defendant twice whether he ever lived on Morton Street, then after defendant's denials, asked him why the address appeared on his drivers' licence, and then followed up with a question about a past address and how long he lived there, the agents' action went beyond the routine booking question exception and questions amounted to interrogation); <u>United States v. Parra</u>, 2 F.3d 1058, 1067-68 (10th

Cir. 1993); <u>Santana v. Warden of PBSP</u>, No. 2:10-CV-2317 FCD KJN P, 2011 WL 3583411, at *10-11, 13 (E.D. Cal. Aug. 12, 2011) (explaining that while initial un-Mirandized question posed to defendant regarding his name was not interrogation, subsequent questions designed to elicit a response showing that the name defendant gave was not his identity was interrogation); <u>United States v. Nogueira</u>, No. 08-CR-876 (JG), 2009 WL 3242087, at *3 (E.D.N.Y. Oct. 6, 2009) (explaining that questions designed to challenge the truthfulness of the defendant's answers to routine booking questions did not fall within the ambit of the routine booking exception and amounted to custodial interrogation necessitating suppression under <u>Miranda</u>); <u>United States v. Villota-Gomez</u>, 994 F. Supp. 1322, 1334 (D. Kan. 1998) (explaining that questioning designed to ascertain that defendant gave false identity to law enforcement officers was clearly designed to elicit incriminating information and the fact that the information obtained by that question was actually used in booking the defendant under his true name did not convince the court that question was subject to booking exception); <u>United States v. Minkowitz</u>, 889 F. Supp. 624, 628 (E.D.N.Y. 1995) (questioning defendant regarding the name on a credit card pulled from his wallet which was different than name defendant initially gave arresting agents was not routine booking exception).  Likewise, other investigatory questions were asked, such as what state Mitchell was from, how long he had been living in Georgia, the address where he had lived before, information about his relatives, why he is called Gerald, and whether he grew up in Texas or Oklahoma.  These

40

questions were not run of the mill biographical questions but rather were designed to elicit incriminating responses showing Mitchell's connection to Oklahoma and Texas and Mitchell's presence in Texas during the robberies in Texas and his presence in Georgia during the robberies in Georgia.  (11:30-19:24); Pacheco-Lopez, 531 F.3d at 424-25 (explaining that pre-Miranda statements were not merely biographical where defendant was asked where he was from and when he arrived at house which was the locale of drug sale and such questions were presumed compelled and excluded from trial); United States v. Corey, 861 F. Supp. 2d 1341, 1344 (S.D. Fla. 2012) (explaining that the question "what are you doing in the area" could be expected to yield an incriminating response, was an investigatory question, and was not allowed under the booking exception); United States v. Stewart, No. 09-312 (PJS/FLN), 2010 WL 11537788, at *5 (D. Minn. Apr. 13, 2010) (explaining that questions about whether defendant lives with anyone at his address, details about his girlfriend's name, and what the defendant does for money after defendant indicated he was not employed were not routine biographical questions). Here, the officers were investigating a series of armed robberies that occurred first in Texas and then in Georgia, questions concerning where Mitchell lived and when he lived there, who he knew in the locations, and how he met Co-Defendant Wiley were investigatory, sought potentially incriminatory information.  Under these circumstances, the detectives began their investigation well before Miranda warnings were administered and thereby, learned information which led to their being able to discover the outstanding

41

warrants.  Accordingly, this Court cannot conclude that the discovery of the Texas warrant for Mitchell's arrest was an intervening cause because it was only discovered as a result of the officers' un-Mirandized questions regarding Mitchell's identity, which led the officers to information about the warrants.

       c.  *Probable Cause To Make an Arrest Was Not an Intervening Circumstance*

    Likewise, probable cause to make the arrest has not been shown to be an intervening circumstance.  Although probable cause to make an arrest can be an intervening event that attenuates a confession, the facts giving rise to probable cause in Mitchell's case were based on facts obtained as a result of the illegal arrest and unlawful interrogation.  Until the point at which Mitchell divulged his identity, the officers did not know who he was and did not have anything to connect him with the robberies or the evidence of the robberies found at the Favors Road residence, other than his mere presence at the property.  As discussed above, Mitchell's presence at the property was not enough to establish probable cause.  Accordingly, the development of probable cause would have stemmed from Mitchell's unlawful arrest and interrogation and therefore, was not an intervening circumstance in this case.  Taylor, 457 U.S. at 692-93 (explaining that arrest warrant obtained while petitioner was being interrogated based on comparison of fingerprints found at the scene of the crime and petitioner's fingerprints, which had been taken immediately after his arrest, was not intervening circumstance because the fingerprints were themselves the fruit of petitioner's illegal arrest); McDaniel v. Polley,

42

847 F.3d 887, 895 (7th Cir. 2017) (explaining that probable cause for an arrest can be an intervening circumstance where the probable cause did not stem from information gained as the result of the illegal arrest).

<blockquote>2.   The Passage of Time Between Defendant Mitchell's Arrest and His Confession Does not Support a Finding of Attenuation</blockquote>

The Government contends that the temporal proximity between the Defendant Mitchell's arrest and his confession weighs in favor of finding sufficient attenuation between the arrest and the confession.  The fact that Defendant Mitchell's confession occurred six or more hours after his arrest is not sufficient to purge the taint.  The lengthy period in which Defendant Mitchell was held at the police station does not militate in favor of finding that the taint was purged because Mitchell remained in police custody, was unrepresented by counsel, and remained handcuffed to a desk the entire time.  Thus, it served only as a hard reminder of his continued illegal arrest, and no doubt triggered further anxiety.  Taylor, 457 U.S. at 691 (explaining that the six hours between the illegal arrest and confession did not serve as an intervening event because the defendant was in police custody, unrepresented by counsel, questioned on several occasions, fingerprinted, and subjected to a lineup); McDaniel, 847 F.3d at 894 (explaining that twenty-four hours between illegal arrest and confession did not attenuate the arrest because defendant was in custody the entire twenty-four hours, did not talk to a lawyer, was questioned multiple times, and was subjected to a corporal lineup).  Furthermore, based on this Court's review of the video of Mitchell's interrogation, the extra hours handcuffed to a desk appears to

43

have worn Mitchell down instead of reviving him or giving him time to think.

### 3.    The Police Misconduct Was Flagrant

Finally, the police misconduct here was flagrant.   "Exclusionary purpose and misconduct [are] demonstrated when the arrest was for 'investigatory' reasons and was effected 'to cause surprise, fright, and confusion.'"   Parker v. Allen, 565 F.3d 1258, 1292 (11th Cir. 2009).   The impropriety of the arrest was obvious and the purpose for the transport to the police headquarters was clearly for the purpose of investigation and questioning.   Although Officer Reid testified that the officers transported Mitchell and the others who were secured at the scene to protect bystanders, there is no indication that Mitchell was anything other than compliant. (Tr. 39, 43).   Moreover, it is apparent that the officers also moved Mitchell and others to the headquarters to interrogate them.   Here, there is no indication that Mitchell was only present at the police headquarters in order to keep the scene more secure and to protect others because he remained at the headquarters after the execution of the search warrant was complete.   (Tr. 43, 80 (admission by Detective Selleck his belief that when the officers interviewed the suspects at headquarters, they knew the results of the execution of the search warrant and whether law enforcement officers found anything of evidentiary value)); Gov't Br. 14 (indicating that the search of the house was underway for "a significant amount of time that Mr. Mitchell was detained at the police station").   The execution of the search warrant began in early afternoon. (Tr. 13).   Individuals were transported to the police headquarters and interviews began around 12:00 p.m. (Tr. 152).   The search continued

44

until at least 3:12, at least four hours prior to Mitchell's interview.  (Tr. 160).  Detective Selleck admits that when he and Detective Raissi did the interview at headquarters, they knew the results of the execution of the search warrant.  (Tr. 80).  Detective Raissi also admitted that a total of five individuals were "actually transported from the residence to Cobb Police Headquarters for *interviews*."   (Tr. 169 (emphasis added)).   The Government's brief appears to concede as much and the fact that the police conducted five (or more) interviews of the occupants of the residence at the station strongly indicates that the purpose of transporting them to the police station was investigatory. See Gov't Br., Doc. 125, at 9-10, 12 (indicating that Mitchell's detention was investigatory and that "[a] natural consequential scope of executing this search warrant was, of course, to then interview and investigate the various individuals inhabiting [the Favors Road residence]"), 13 (indicating that Mitchell needed to be transported for the safety of all involved and "to maintain a stable investigation"); Brown v Illinois, 422 U.S. 590, 605 (1975) (indicating that the police misconduct was flagrant as the impropriety of the arrest was obvious in that the arrest's purpose "both in design and in execution" was investigatory where the detectives acknowledged that the purpose of their action was for investigation and questioning); Tello-Lopez, 2018 WL 3827404, at *6-7 (explaining that the police misconduct was flagrant where they were consciously aware that they lacked probable cause to arrest the defendant, but nevertheless proceeded to bring him in for the purpose of questioning even though such tactics had been consistently condemned by the Supreme Court for forty years).  Under the circumstances of this case, the taint of

45

Defendant Mitchell's unlawful arrest was not dissipated prior to the time he began making statements to the detectives.

### D.   Defendant Mitchell's Statements Were Not Voluntary

This Court also finds that Defendant Mitchell's statements were not voluntary. Defendant Mitchell argues his statements were not voluntary because he was not aware of the nature of the right that he was giving up and the consequences of his decision to abandon it. In support, Mitchell contends that Detectives Raissi and Selleck constantly made implied promises about how making a statement would "help him in the long run," would "help him in a million different ways," and that if he cooperated "it could only get better from here." The Fifth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibit the use of an involuntary confession against a defendant in a criminal trial. U.S. CONST. amend. V; U.S. CONST. amend. XIV, cl. 3; Dickerson v. United States, 530 U.S. 428, 434-35 (2000); Bram v. United States, 168 U.S. 532, 542, (1897); United States v. Vera, 701 F.2d 1349, 1365 (11th Cir. 1983). When the government seeks to use a confession obtained through custodial interrogation against a defendant, the government must demonstrate that the defendant voluntarily, knowingly, and intelligently waived his Fifth Amendment rights under Miranda. Miranda v. Arizona, 384 U.S. 436, 475 (1966); Hart v. Florida, 323 F.3d 884, 891 (11th Cir. 2003). Whether a waiver was voluntary, knowing, and intelligent presents a two-fold inquiry. Courts assess the voluntariness of the defendant's relinquishment of his rights to see if "it was the product of a free and deliberate choice

46

rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986); see also Hart, 323 F.3d at 892. The court must find government coercion to conclude that a waiver was involuntary. "Absent police conduct causally related to the confession, there is . . . no basis for concluding that any state actor has deprived a criminal defendant" of his rights. Colorado v. Connelly, 479 U.S. 157, 164 (1986); United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995). To determine whether the relinquishment was knowing and intelligent, courts must determine whether the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Burbine, 475 U.S. at 421. A court may only hold that a defendant validly waived his Fifth Amendment rights under Miranda if it finds that "the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension." Id.

The totality of the circumstances test takes into consideration "both the characteristics of the accused and the details of the interrogation" to determine whether police conduct was causally related to the confession. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); see also Haynes v. Washington, 373 U.S. 503, 513 (1963); Reck v. Pate, 367 U.S. 433, 440 (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"). The court reviews numerous factors under this analysis, including the accused's intelligence, education, age, drug and alcohol use, psychological problems, and prior experience with the criminal justice system, as well as the length of the detention, the nature of the interrogation, the application of physical force or the

threat thereof, and the use of a promise or inducement by police. <u>Hubbard v. Haley</u>, 317 F.3d 1245, 1252-1523 (11th Cir. 2003) (citing <u>Garcia</u>, 890 F.2d at 360).

     Under the totality of the circumstances of this case, the Court finds thayt Defendant Mitchell's statements were not knowing or voluntary.  First, as discussed above, Defendant Mitchell made a number of statements without the benefit of <u>Miranda</u> warnings.  Second, even though Detective Selleck gave Defendant his <u>Miranda</u> warnings after several minutes of questioning, Defendant Mitchell's statements still were not voluntary because the detectives misled him as to the nature of the right being abandoned and the consequences of the decision to abandon it.  This principle is explained by the Eleventh Circuit Court of Appeals in <u>Hart v. Attorney Gen. of the State of Florida</u>, 323 F.3d 884 (11th Cir. 2003).  In <u>Hart</u>, the Eleventh Circuit concluded that although Hart received his <u>Miranda</u> warnings and signed the waiver form to indicate that he understood each right and was willing to answer questions, Hart's waiver was the product of deception and was not made with the full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  <u>Id.</u> at 893.  In that case, during the interrogation, Hart asked to speak with Detective Schuster, a detective he knew.  <u>Hart</u>, 323 F.3d at 888.  Schuster testified that Hart told her that he asked to speak to her because he thought of her as a friend and that he believed she would not lie to him. <u>Id.</u> at 888.  Hart asked Schuster whether she would get an attorney if she were in his shoes and Schuster told him that she could not answer that question and that he had to make his own decision and then left the room so defendant could consider his decision.  <u>Id.</u> at 888.

Hart asked Schuster what the pros and cons of having an attorney was, and Schuster explained that "He'll protect your rights.  He'll tell you what to answer, what not to answer, and he'll be here for you."  Id.  Schuster then told Hart that the con in her opinion was "I'm going to want to ask you questions and he's going to tell you you can't answer me."  Id.  Schuster further told Hart that whatever he told her she was obligated to repeat to the prosecutor, the judge, his attorney, and anyone else involved in the investigation who asked.  Id. at 889.  Schuster testified that she never used the word cooperate or told Hart that giving a statement would help his present situation, but she also admitted telling him "honesty wouldn't hurt him."  Id. at 889.  After Hart made incriminating statements, Schuster asked Hart if he had given the taped statements voluntarily and he indicated that he had done so.  Id. at 889.  Schuster asked Hart if anyone had made any had threatened or coerced him to make a statement, made any promises or offered a reward to make and statement, and Hart answered "no" to both questions.  Id.

The Eleventh Circuit concluded that Schuster's initial explanation about the pros of having a lawyer would be that his lawyer would protect his rights, tell him what not to answer, and would be there for him was an acceptable answer.  The Eleventh Circuit then reasoned, however, that Schuster's further explanation that the con was that she would want to ask questions and the lawyer would tell Hart that he could not answer her was not acceptable.  Id. at 894.  The Eleventh Circuit panel explained that the reason for requiring a lawyer during custodial interrogation is to protect a suspect's privilege against self incrimination and in essence, Schuster was telling Hart that this was a disadvantage

49

of having a lawyer.  Id. at 894.  The Eleventh Circuit also reasoned that Schuster's statement that honesty would not hurt him contradicted the Miranda warning that anything he said could be used against him in court because it suggested that an incriminating statement would not have detrimental consequences.  Id. at 894.

Similarly, in United States v. Beale, 921 F.2d 1412 (11th Cir. 1991), the Eleventh Circuit found that the defendant did not make a voluntary, knowing, or intelligent waiver of his privilege against self-incrimination when a law enforcement officer advised that signing the waiver of rights form would not hurt him.  Id. at 1435.  The court concluded that advising the defendant that signing the waiver form could not hurt him contradicted the Miranda warning that a defendant's statements can be used against the defendant in court.  Id.  Accordingly, the court found that law enforcement officers misled the defendant concerning the consequences of relinquishing his right to remain silent and the district court erred by admitting the defendant's statement.  Id.

Just as in Beale and in Hart, under the totality of circumstances in this case, the detectives deceived Defendant Mitchell about the nature of the right he was giving up and the consequences of giving up that right.  While Detective Selleck did review the Miranda warnings with Mitchell, the detectives' statements during the course of the interrogation negated the warnings because they misled Mitchell about the consequences of making statements.  The detectives, while attempting to persuade Mitchell to make incriminating statements about the robberies, indicated to Mitchell that his situation was very precarious because he was being detained, he was in the middle of an armed robbery

50

investigation, and his situation was as bad as it could get.  (Gov't Ex. 3, at 0:48, 1:36).

The detectives painted a picture that Mitchell was in a deep hole, that things for Mitchell

could not possibly get any worse, and that his only way out was honesty and cooperation.

Then, the detectives repeatedly urged Mitchell to be honest, insisted that honesty could

not hurt him, and suggested that if Mitchell was honest, it was possible that he may get

to return home after the detectives assessed the information he supplied.  (Gov't Ex. 3,

at 1:51).  For instance, Detective Raissi told Mitchell after approximately and hour and

a half, "[I]f you tell us the truth and cooperate, it's only going to help you in the long

run," "You can't go anywhere but better from here, if you cooperate," it "can't go worse,"

and "it can only get better if you cooperate."  (Gov't Ex. 3, at 1:35-1:36).  While the

detectives did indicate that they could not promise anything, they also indicated that

cooperation could only help.  (Gov't Ex. 3, at 1:36).  One of their conversations went

as follows:

> Raissi:      What happens from here is totally up to you.  It really is.  It's
> totally up to you.  Because if you tell us the truth and
> cooperate, it's going to help you in the long run.
>
> Mitchell:    Like how?
>
> Raissi:      There's a million different ways it can help.   With the
> prosecutor's discretion.  The uh . . .
>
> Mitchell:    So, am I being arrested?
>
> Selleck:     You're detained right now.  You're in the middle of an armed
> robbery investigation.
>
> Raissi:      Correct.   So what you do now and what goes on, it can

51

|                |                                                                                                                                                                                                                                                                                             |
|----------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                | absolutely change everything for the better for you.  You can't go anywhere but better from here if you cooperate.                                                                                                                                                                          |
| Selleck:       | (Laughing).  You can't go anywhere from better.                                                                                                                                                                                                                                            |
| Raissi:        | Exactly.  It can't go worse.                                                                                                                                                                                                                                                                |
| Selleck:       | It can't go worse.                                                                                                                                                                                                                                                                          |
| Raissi:        | It can't go worse.                                                                                                                                                                                                                                                                          |
| Selleck:       | It can't go worse.  It's about as worse as you can get right now.  I'm telling you this is bad.                                                                                                                                                                                              |
| Raissi:        | It can only get better from here.                                                                                                                                                                                                                                                           |
| Selleck:       | This is what I've been trying to tell you the whole time, man.  Maybe you weren't getting it.  Maybe I wasn't explaining it right to you.  You are in the midst of an armed robbery investigation.   You are detained right now.                                                             |
| Raissi:        | It can only get better if you cooperate.                                                                                                                                                                                                                                                    |
| Selleck:       | That's why I'm telling you.  I'm throwing the lifeline.  Okay.  So is he.  We know your minimal sum.  We know you're involved.  Okay?  You've got to tell me.  I can't promise you anything.  I can't give you any deals.  I can't do anything like that.                                      |
| Raissi:        | *But it can only help*.                                                                                                                                                                                                                                                                     |
| Selleck:       | But I can tell you this.  Where you're at right now.  It ain't good.                                                                                                                                                                                                                        |
| Mitchell:      | Uh, this is terrible.                                                                                                                                                                                                                                                                       |
| Selleck:       | This is your opportunity.  I need you to tell me what's going on. Wednesday.  Let's talk about Wednesday.                                                                                                                                                                                    |

(Gov't's Ex. 3, at 1:35-1:36).   The detectives' strategy to persuade Mitchell to confess

was based on the notion that he was scared, in a very bad situation, and the only lifeline that could help him was to tell them the truth.  The detectives pushed their strategy hard, often telling Mitchell that they were throwing him a lifeline and often threatening that the window of opportunity was closing and that they were going to close the interrogation. (Gov't's Ex. 3, at 0:57-0:59; 1:02, 1:10, 1:36).  At one point, Detective Selleck raised his voice at Mitchell, told Mitchell that he was implicated in a serious armed robbery, and threatened to walk out.  (Gov't's Ex. 3, at 1:47).  While the detectives did state that they could not promise Mitchell anything or offer him deals, the detectives also implied that Mitchell might not be arrested if he told them the whole story, implied that Mitchell's honesty might avoid a formal arrest, and directly told Mitchell that his honesty could only make things better.   Thus, just as in Hart, the detectives' interrogation strategy contradicted the Miranda warning that anything Mitchell said could be used against him in court because the detectives repeatedly suggested that potentially incriminating statements would not have detrimental consequences–that such statements could only help him and not hurt him.  Hart, 323 F.3d at 894.  Moreover, Mitchell, who was very youthful, possibly around twenty-two years old, appeared somewhat impressionable, distraught, and appeared to want to please the detectives.  As the interrogation wore on, Mitchell appeared more and more exhausted and susceptible to the detectives' interrogation strategy.  Mitchell constantly bowed his head, put his head down on the table, rubbed his hair, paced miserably when officers were not in the room, talked to himself, and appeared genuinely exhausted and worn-down after a full day of being held

at the police headquarters handcuffed to a chair and subjected to a lengthy interrogation. (Gov't's Ex. 3, at 1:47, 2:02, 2:25, 2:38, 2:40).  In this Court's view, under the totality of the circumstances, Defendant Mitchell's statements were not knowing, intelligent, or voluntary.  Hart, 323 F.3d at 894; Beale, 921 F.2d at 1435; United States v. Ramirez, 991 F. Supp. 2d 1258, 1270 (S.D. Fla. 2014) (concluding that where officers advised it would be worse if defendant did not provide a statement and no part of Miranda warning advised defendant that his silence could not be used against him, waiver was not knowing, intelligent, and voluntary).  Because Defendant Mitchell's statements were not knowing, intelligent, or voluntary, and were the product of his illegal arrest, Defendant Mitchell's statements at police headquarters should be **SUPPRESSED**.

## **DEFENDANT MITCHELL'S MOTION FOR BILL OF PARTICULARS**

In Defendant Tevin Mitchell's Motion for a Bill of Particulars (Doc. 62), Mitchell seeks the names of all participants in the conspiracy, the nature of any uncharged overt acts of the conspiracy, the circumstances of each defendant's participation in the conspiracy, approximate dates when each defendant allegedly joined the conspiracy, and dates and locations of each robbery charged in the Indictment.  In response, the Government explained that the participants known to the Government in the robberies have been named in the indictment as defendants.  The Government also identified one individual no named in the indictment.  The Government refused, however, to provide Mitchell with all the overt acts that might be proven at trial.  The Government also argued that it has already disclosed numerous state and federal reports concerning the charged

offenses, as well as numerous electronic files relating to those same offenses. Additionally, the Government argues Mitchell has had the benefit of a full and thorough cross-examination of witnesses in connection with his Motions to Suppress, which allowed him to receive additional reports in the form of Jencks material.

Pursuant to Federal Rule of Criminal Procedure 7(f), "[t]he court may direct the government to file a bill of particulars." Fed. R. Crim. P. 7(f). The purpose of a bill of particulars is "to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." United States v. Anderson, 799 F.2d 1438, 1441 (11th Cir. 1986) (quoting United States v. Cole, 755 F.2d 748, 760 (11th Cir. 1985)). A bill of particulars supplements an indictment by providing information *necessary* for a defendant to prepare for trial, and it is not meant to function as a discovery device. Anderson, 799 F.2d at 1441-42 (emphasis in original); see also United States v. Salisbury, 983 F.2d 1369, 1375 (6th Cir. 1993) (stating that a bill of particulars "is not meant as a tool for the defense to obtain detailed disclosure of all evidence held by the government before trial") (citing United States v. Kilrain, 566 F.2d 979, 985 (5th Cir. 1978)); United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990) ("Acquisition of evidentiary detail is not the function of the bill of particulars.") (quoting Hemphill v. United States, 392 F.2d 45, 49 (8th Cir. 1968), implied overruling on other grounds recognized, United States v. Lattimore, 946 F. Supp. 245, 246 (W.D.N.Y. 1996). The Court is vested with broad discretion in deciding whether to grant a motion for bill

55

of particulars.  Cole, 755 F.2d at 760; United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981).  However, "where an indictment fails to set forth specific facts in support of requisite elements of the charged offense, and the information is essential to the defense, failure to grant a request for a bill of particulars may constitute reversible error."  Cole, 755 F.2d at 760; see also United States v. Sharpe, 438 F.3d 1257, 1263 n.3 (11th Cir. 2006) (noting that an indictment need not allege in detail the factual proof that will be relied upon to support a charge but that failing to grant a motion for a bill of particulars to obtain information essential to the defense may be reversible error); United States v. Rosenthal, 793 F.2d 1214, 1227-28 (11th Cir. 1986) (holding that the government was not required to provide the defendant with the essential facts regarding the formation of a conspiracy or every overt act that might be proven at trial) (modified on other grounds by United States v. Rosenthal, 801 F.2d 378 (11th Cir. 1986)).  Mitchell is not entitled to a bill of particulars with respect to information which is already available through other sources such as the indictment and discovery.  United Staes v. Holzendorf, 576 F. App'x 932, 936 (11th Cir. 2014); Rosenthal, 793 F.2d at 1227.

## I.   Participants in the Conspiracy

Mitchell seeks disclosure of all participants in the conspiracy.  The Government has responded that the participants known to the government are named in the Indictment as defendants and that an individual who is not named in the Indictment is Dashinay Holmes.  (Doc. 138).  On Reply, Mitchell argues that specific allegations as to the participants in the robberies has not been formally made, that the Government has not

56

provided a list of unindicted co-conspirators, that no individual has been named as an alleged participant in the two Oklahoma GameStop locations, and that no other disclosures adequately addresses the missing information about the participants.  (Doc. 144).  Informing the defendant of the names of alleged unindicted coconspirators has been held a proper use of a bill of particulars, but whether the court orders the disclosure of the unindicted co-conspirators is within the court's discretion.  Colson, 662 F.2d at 1391-92; United States v. Mackey, 551 F.2d 967, 970 (5th Cir. 1977); United States v. Gilbert, No.  2:17-cr-00419-AKK-TMP, 2018 WL 2088389, at *3 (N.D. Ala. May 4, 2018).

This Court held a teleconference on June 24, 2019.  During the teleconference, counsel for the Government indicated that she would provide reports covering information about the robberies of the two GameStop locations in Oklahoma.  Accordingly, Mitchell's Motion is **GRANTED** with respect to disclosure of the co-conspirators involved in the GameStop robberies in Oklahoma.  The Government shall provide the promised reports within fourteen (14) days of the date of this Order and Report and Recommendation.  Mitchell's Motion is **DENIED** with respect to the remainder of the requested information, to the extent that such information is not within the promised reports.

**II.** **Nature of Uncharged Overt Acts, Circumstances of Each Particular Defendant's Participation in the Conspiracy, and the Dates and Locations of the Robberies**

Mitchell contends that he is entitled to disclosure of the nature of any uncharged

overt acts, the circumstances of each particular defendant's participation in the conspiracy, and the dates and locations of each of the robberies. The Government contends that it is not required to provide Mitchell with all overt acts that might be proved at trial and that the requested information is beyond the scope of a bill of particulars. Additionally, the Government contends it has produced numerous federal and state reports concerning the charged offenses as well as numerous electronic files relating to the offenses as well as Jencks material. The Government further points out that Mitchell has had the benefit of a full and thorough cross examination of several witnesses. Mitchell replies that the Indictment does not specify when the robberies of the GameStop stores in the Indictment, parts 1-3 (the Texas and Oklahoma GameStop robberies) transpired. Mitchell also contends that it is not apparent from the Indictment which Defendants are alleged to have participated in offenses pertaining to the GameStops in Oklahoma and Texas. Mitchell argues that while the Texas robbery was discussed during cross-examination, specific allegations as to the identity of the participants in the Texas and Oklahoma robberies have not been formerly made. Indeed, no individual has been named as a participant with respect to the Oklahoma robberies.        The Court finds that the Government is not required to provide the nature of uncharged overt acts or the circumstances of each Defendant's participation in the conspiracy. Here, the Indictment already provides the nature of the conspiracy. The Indictment makes it clear that Defendants conspired together for the purposes of committing Hobbs Act robberies of various GameStops and the Hibbett Sports, the Indictment provides the locations of the

GameStops and Hibbett Sports which were robbed, and provides a narrow, less than two-month date range as to when the robberies occurred. (Doc. 69). Furthermore, just the documents submitted to this Court in support of the various Motions to Suppress submitted by the Defendants provide a great deal of detail about the armed robberies. The government is not required to provide defendants with all overt acts that might be proven at trial. <u>Rosenthal</u>, 793 F.2d at 1227; <u>Colson</u>, 662 F.2d at 1391. Thus, to the extent that Mitchell is requesting all of the dates, times, locations, and actions undertaken by himself or his co-conspirators, in furtherance of the conspiracy, his request exceeds the proper scope of a bill of particulars. <u>United States v. Pate</u>, No. 118-008, 2018 WL 3825219, at *2 (S.D. Ga. Aug. 10, 2018); <u>United States v. Martin</u>, No. 1:16-cr-00218-LMM-RGV, 2016 WL 11489244, at *7 (N.D. Ga. Nov. 16, 2016).

Nevertheless, the Court agrees with Mitchell that with respect to the two Oklahoma robberies, he is entitled to learn the dates of the robberies committed by the conspiracy as well as participants in the robberies in order to minimize surprise at trial and allow him to prepare his defense. As noted above, the Government has agreed to provide a report outlining information about the Oklahoma robberies. Accordingly, Mitchell's Motion is **GRANTED** with respect to providing the dates of the Oklahoma robberies as well as the participants believed to be involved in the two Oklahoma robberies. The Motion is **DENIED** as to the remainder of the information sought to the extent that such information is not included in the reports to be provided.

59

### III.   __Approximate Dates as to When Each Defendant Joined the Conspiracy__

Mitchell requests the approximate date as to when each Defendant joined the conspiracy.  The Government contends that such information is beyond the scope of a bill of particulars and that Mitchell has received numerous state and federal reports concerning the charged offenses, numerous electronic files, and Jencks material.  In addition, the Government indicates that Mitchell has had the benefit of a full and thorough cross examination of witnesses in connection with his motions to suppress.  A bill of particulars cannot be used to compel the government to provide the essential facts regarding the existence and formation of a conspiracy.  Rosenthal, 793 F.2d at 1227.  Case law makes clear "that the Government is not required to identify the exact dates or details of when a defendant or any conspirator joined or withdrew from a charged conspiracy."  United States v. Henley, No. 1:16-CR-00151-LMM-JFK, 2017 WL 2952821, at *16 (N.D. Ga. May 19, 2017); see also United States v. Martell, 906 F.2d 555, 558 (11th Cir. 1990) (holding that the government is not required to provide defendant with all the overt acts that might be proven at trial); United States v. Abdi, No. 1:13-CR-484-JEC-RGV, 2014 WL 3828165, at *8 (N.D. Ga. Aug. 4, 2014); United States v. Leiva-Portillo, No. 1:06-CR-350-WSD-LTW, 2007 WL 1706351, at *15 (N.D. Ga. June 12, 2007).  Accordingly, Mitchell's request for the approximate date as to when each Defendant joined the conspiracy is **DENIED**.

60

## DEFENDANT TOREY STARLING'S MOTION TO DISMISS INDICTMENT (Counts I and II)

On April 4, 2017, the Grand Jury charged Defendant Torey Starling with one count of conspiracy to commit robbery of a GameStop and Hibbett Sports in violation of 18 U.S.C. § 1951(a), three counts of Hobbs Act robbery and/or aiding and abetting Hobbs Act Robbery in violation of 18 U.S.C. § 1951(a) and 2, and two counts of brandishing a firearm and/or aiding and abetting the brandishing of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and 2.  (Doc. 1).  On June 22, 2017, Defendant Starling moved to dismiss Count One of the Indictment on the grounds that it charges him with conspiracy to commit Hobbs Act robberies in Oklahoma, Texas, and Georgia, even though there was no evidence showing his involvement in any of the crimes in Texas or Oklahoma.  (Doc. 47).  Starling also moved to dismiss Count Two of the Indictment alleging he aided and abetted in a robbery which occurred at the Cobb Parkway GameStop, on the grounds that there was no evidence showing his involvement in that particular robbery.  (Doc. 47).

## I.   Count II

Since Defendant Starling filed his Motion to Dismiss, the Government filed a Superseding Indictment. (Doc. 69).  The Superseding Indictment removed Starling from Count Two.  (Doc. 69).  The Government concedes that the original Indictment erroneously included Starling in Count Two.  (Doc. 132).  Accordingly, Defendant Starling's Motion to Dismiss should be **DEEMED MOOT** as to Count Two.  (Doc. 47).

61

## II.   Count I

Both Count One of the original Indictment and the Superseding Indictment alleges Defendants Tevin Mitchell, Tyvonne Wiley, and Torey Starling conspired to commit Hobbs Act robberies. (Doc. 69, at 1-2). The robberies were alleged to have occurred at the following locations: two GameStop locations in Oklahoma, one GameStop location in Texas, two GameStop locations in Georgia, and two Hibbett Sports locations in Georgia. (Id.). Starling argues in his Motion to Dismiss that Count One should be dismissed as to him because it alleges conspiracy to commit Hobbs Act robberies at locations in Oklahoma and Texas, even though there is no evidence that he was involved in a conspiracy to commit crimes in those states. (Doc. 47). The Government admits that it has not alleged that Starling was present or involved in robberies that occurred in Oklahoma. (Doc. 132). Nevertheless, the Government contends that Starling may be convicted of conspiracy even if he only played a minor role in the conspiracy and was not involved in all aspects of the conspiracy. (Doc. 132). The Government further contends that Starling can be: (1) vicariously liable for the substantive criminal offenses committed by co-conspirators; (2) convicted even though he joined the conspiracy after its inception; and (3) convicted even if the Government does not prove that he participated in all aspects of the conspiracy. (Doc.132). On reply, Starling argues he cannot be a co-conspirator for the crimes that occurred in Oklahoma or Texas since those crimes occurred prior to any event in Georgia and he was not present in either Oklahoma or Texas during the robberies. (Doc. 133).

62

Federal Rule of Criminal Procedure 12(b)(3)(B) allows a defendant to file a motion alleging a defect in the indictment or information. Fed. R. Crim. P. 12(b)(3)(B). "An indictment is considered legally sufficient if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." United States v. Schmitz, 634 F.3d 1247, 1259 (11th Cir. 2011). The sufficiency of a criminal indictment is determined from its face. United States v. Salman, 378 F.3d 1266, 1268 (11th Cir. 2004), quoting United States v. Critzer, 951 F.2d 306, 307 (11th Cir. 1992). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." United States v. Garrett, 467 F. App'x 864, 867 (11th Cir. 2012) (citing Hamling v. United States, 418 U.S. 87, 117 (1974)); see also Critzer, 951 F.2d at 307-08; United States v. Malone, No. 804CR348T24TGW, 2005 WL 1243762, at *3 (M.D. Fla. May 25, 2005) (finding that indictment for extortion conspiracy sufficient to withstand a motion to dismiss because it tracked the language of the extortion conspiracy statute which set forth the essential elements of the crime). An indictment is defective if it is not framed to apprise the defendant with reasonable certainty of the nature of the accusation against him, even though it may follow the language of the statute. United States v. Bobo, 344 F.3d 1076, 1083 (11th Cir. 2003). Thus, "if the indictment tracks the language

63

of the statute, it must be accompanied with a statement of facts and circumstances that will inform the accused of the specific offense, coming under the general description, with which he is charged." Id. (internal quotation marks and citation omitted).

If the indictment tracks the language of the statute, it must be accompanied with a statement of facts and circumstances that will inform the accused of the specific offense, coming under the general description, with which he is charged. Malone, 2005 WL 1243762 at *3. That being said, "[i]t is not necessary for an indictment . . . to allege in detail the factual proof that will be relied upon to support the charges. That information, if essential to the defense, can be obtained by a motion for a bill of particulars." United States v. Sharpe, 438 F.3d 1257, 1263 n.3 (11th Cir. 2006). Furthermore, there is no provision for a pretrial determination the sufficiency of the evidence; the sufficiency of a criminal indictment is determined from its face. Id. (explaining that it was improper for trial court to dismiss indictment based on overall sufficiency of evidence presented at trial, which was not part of the indictment); see also Salman, 378 F.3d at 1267-68 (quoting Critzer, 951 F.2d at 307). When a court analyzes the sufficiency of an indictment, it reviews the indictment "as a whole and give[s] it a 'common sense construction.'" United States v. Jordan, 582 F.3d 1239, 1245 (11th Cir. 2009) (quoting United States v. Gold, 743 F.2d 800, 813 (11th Cir. 1984)).

Here, this Court finds that Count One of the Superseding Indictment is legally sufficient because substantially repeats the language of 18 U.S.C. § 1951 and contains the essential elements of a Hobbs Act conspiracy. (Doc. 1). Count One provides in part:

64

> Beginning on or about September 5, 2016, and continuing until on or about October 28, 2016, in the Northern District of Georgia, the defendants, TEVIN MITCHELL, TYVONNE WILEY, and TOREY STARLING, and others whose identities are known and unknown to the grand jury, did obstruct, delay and affect commerce by robbery, as that term is defined in Title 18 United States Code, Section 1951, by knowingly and willfully conspiring, combining, confederating, agreeing and having a tacit understanding with each other and others to unlawfully take and attempt to take property, consisting of United States currency, from the presence of employees of GameStop and Hibbett Sports against the will of those employees, by means of actual and threatened force, violence and fear of injury, all in violation of Title 18, United States Code, Section 1951(a). (Doc.1).

(Doc. 69, at 2-3).  The elements of a Hobbs Act conspiracy include: (1) two or more people agreeing to commit a Hobbs Act robbery; (2) the defendant's knowledge of the conspiratorial goal; and (3) the defendant's voluntary participation in furthering that goal. United States v. Ransfer, 749 F.3d 914, 930 (11th Cir. 2014).  "The two required elements for a substantive Hobbs Act conviction are 'robbery and an effect on [interstate] commerce.'"  United States v. Taylor, 480 F.3d 1025, 1026-27 (11th Cir. 2007) (quoting United States v. Rodriguez, 218 F.3d 1243, 1244 (11th Cir. 2000)).  The interstate nexus can be proved by showing a potential impact on interstate commerce.  Taylor, 480 F.3d at 1027.

First, the Government sufficiently alleged the first element of a Hobbs Act conspiracy, that two or more people agreed to commit a Hobbs Act robbery by alleging that three Defendants were involved, Defendants "conspir[ed], combin[ed], confederat[ed], and agree[ed]."  (Doc. 69, at 2-3, ¶ 8).  The Government adequately alleges that Defendants agreed to commit a Hobbs Act robbery because the Indictment

65

indicates that the Defendants unlawfully took property against the will of GameStop and Hibbett Sports employees by means of actual and threatened force, violence, and fear of injury.  Compare Doc.69, at 2-3 with 18 U.S.C. § 1951(b) (explaining that robbery means "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession . . . of anyone in his company at the time of the taking or obtaining"); see also United States v. Woodruff, 296 F.3d 1041, 1047 (11th Cir. 2002) (explaining that indictment sufficiently alleged Hobbs Act robbery where it alleged that Woodruff "did unlawfully take and obtain personal property by means of actual and threatened force, violence, and fear of immediate injury" because it tracked the language of the statute and knowledge element could be inferred).  The Government then addressed the second and third elements of a Hobbs Act conspiracy, that Defendants had knowledge of the conspiratorial goal and voluntarily participated in furthering that goal, by indicating that the Defendants' actions were knowing and willful.  (Doc. 69).  Not only does Count One track the language of the statute, Count I also provides additional detail about the robberies.  The Government alleges in Count One that Starling "obstruct[ed], delay[ed], and affect[ed] commerce by robbery," which tracks the language of Section 1951(a) pertaining to interstate commerce almost verbatim.[3]b Compare Doc. 69 with 18 U.S.C.

_____

[3] Section 1951(a) states "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by

66

§ 1951(a).

Additionally, Count One is sufficient because it informs Defendant Starling of his specific offense by supplementing the statutory language with a statement of facts and circumstances. Count One provides the names of the co-conspirators, the locations of the alleged robberies, and the time frame of the conspiracy. (Doc. 69, at 1-3). The Eleventh Circuit has previously found that an indictment alleging such facts is sufficient. United States v. Williams, 181 F. App'x 945, 948-49 (11th Cir. 2006) (holding that an indictment charging defendant with conspiracy was valid as it included each of the necessary elements by identifying defendant's co-conspirators, tracking the elements of the statutes, and stating the estimated time span of the conspiracy); United States v. Ramos, 666 F.2d 469, 474-75 (11th Cir. 1982).

Defendant Starling argues that he cannot be charged for a conspiracy to commit the robberies in Texas and Oklahoma because not only was he not directly involved in those robberies but also the robberies in Oklahoma and Texas occurred prior to his alleged direct involvement in the robberies in Georgia. (Doc. 133). In support, Starling acknowledges that the Government need not prove that each defendant had knowledge of all details and phases of the conspiracy when the defendant knows the essential nature of the conspiracy. (Doc. 133). Starling points out, however, that co-conspirators can

---

robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both."

67

only be held responsible for substantive crimes that are a reasonably foreseeable consequence of the conspiracy. (Doc. 133).  Starling argues he could not reasonably foresee the events occurring in Oklahoma and Texas which occurred prior to his involvement in the crimes that occurred in Georgia.  (Doc. 133).  Starling further argues that there is nothing in the Indictment indicating that he participated in, knew of, or could reasonably foresee the crimes in Oklahoma and Texas.  (Doc. 133).

Contrary to Starling's view, the Eleventh Circuit has reasoned that "[a]n individual cannot escape guilt [of conspiracy] merely because he joined the conspiracy after its inception or because he played a minor role in the total scheme."  United States v. Knowles, 66 F.3d 1146, 1155 (11th Cir. 1995); United States v. Davis, 666 F.2d 195, 200 (5th Cir. 1982) (explaining that prior actions in furtherance of the conspiracy are attributable to one who later joins the conspiracy).   Likewise, the Supreme Court also held in Ocasio v. United States, 136 S. Ct. 1423 (2016), that the Government does not have to prove that the defendant agreed to commit or facilitate each and every part of the substantive offense.  Id. at 1429-30 ("Not only is it unnecessary for each member of a conspiracy to agree to commit each element of the substantive offense, but also a conspirator may be convicted 'even though he was incapable of committing the substantive offense' himself.").  A defendant can be a co-conspirator even if he did not know all aspects or details of the conspiracy or all of the individuals involved, came into the conspiracy after it began and played only a minor role in the conspiracy.  United States v. Hansen, 262 F.3d 1217, 1247 (11th Cir. 2001); Knowles, 66 F.3d at 1155

68

(explaining that an individual cannot escape guilt of conspiracy because he joined conspiracy after its inception or because he played a minor role in the total scheme); United States v. Davis, No. 11-60285-CR, 2013 WL 5741852, at *6 (S.D. Fla. Oct. 23, 2013) (explaining that where the conspiracy charge alleged a single object of the conspiracy (taking of currency and property from Brinks employees by means of actual or threatened force), as long as jurors unanimously found that defendant agreed with at least one other person to try to commit Hobbs Act robberies and that defendant knew the unlawful purpose of the plan and willfully joined it, it does not matter whether the jurors agreed on which particular robbery or robberies Davis was actually involved in executing).  Likewise, where an indictment alleges a conspiracy to commit multiple offenses, the charge is sustained by adequate pleadings and proof of conspiracy to commit any one of the offenses.  United States v. Walker, 758 F. App'x 868, 872 n.1 (11th Cir. 2019) (explaining that "a guilty verdict in a multi-object conspiracy will be upheld if the evidence is sufficient to support a conviction of any of the alleged objects" of the conspiracy); United States v. McKinley, 995 F.2d 1020, 1025 (11th Cir. 1993).  "It is irrelevant that particular conspirators may not have known other conspirators or may not have participated in every stage of the conspiracy; all that the government must allege is an agreement or common purpose to violate the law and intentional joining in this goal by conspirators."  United States v. Richardson, 532 F.3d 1279, 1284-85 (11th Cir. 2008) (explaining that the evidence did not have to establish that all of Richardson's coconspirators only worked together and that even if the coconspirators did drug deals

with each other without Richardson's involvement, that would not undermine the existence of an underlying scheme).  Thus, even if Starling was not present or involved in all of the robberies, Starling still may be charged with conspiracy to commit the robberies as long as he acted in concert with his co-conspirators to further a common goal.  <u>Richardson</u>, 532 F.3d at 1284.  Accordingly, Defendant Starling's Motion to Dismiss Count One of the Indictment should be **DENIED**.  (Doc. 47).

**DEFENDANT STARLING'S MOTION TO DISMISS COUNTS SEVEN AND NINE OF THE SUPERSEDING INDICTMENT**

## I.   BACKGROUND

On November 9, 2017, Defendant Starling moved to dismiss both counts of brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (now Counts Seven and Nine) from the Superseding Indictment. (Docs 69, 91).  Therein, Starling argues Counts Seven and Nine are subject to dismissal because an authorized agent of the United States admitted that he did not use, carry, or brandish a firearm when the agent told him "you ain't pulled no gun on nobody." (Doc. 91).  The Government argues in response that Starling can be charged under Section 924(c) either via constructive possession or vicarious liability since he was the getaway driver for the robberies corresponding with the Section 924(c) violations. (Doc. 132). On reply, Starling contends that the Government proffers that he was the getaway driver, but does not present evidence that he was.  Starling further argues his alleged possession of a firearm is insufficient to convict him for brandishing a firearm under 18 U.S.C. § 924(c).

AO 72A
(Rev.8/82)

(Doc.133).

## II.   **LEGAL ANALYSIS**

In Counts Seven and Nine of the Superseding Indictment, the Grand Jury charged Defendant Starling with knowingly using, carrying, and brandishing a firearm during and in relation to a crime of violence, robbery, and with aiding and abetting his co-defendants in doing so, in violation of 18 U.S.C. §§ 924(c)(1)(A) and Section 2.  Title 18, Section 924(c) of the United States Code provides for enhancement of Starling's sentence if a firearm was used or possessed in connection with a crime of violence.  It provides:

> (c)(1)(A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime —
> . . .
> (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years . . . .

Counts Seven and Nine track the language of Section 924(c).  Counts Seven and Nine of the Superseding Indictment both provide:

> On or about October 26, 2016, in the Northern District of Georgia, the defendants, TEVIN MITCHELL,TYVONNE WILEY, AND TOREY STARLING, aided and abetted by each other, did knowingly use, carry, and brandish a firearm during and in relation to a crime of violence for which the defendants may be prosecuted in a Court of the United states, that is, the robbery described in Count Six [and Count Eight] of this indictment, in violation of Title 18, United States Code, Section 924(c)(1)(A)(ii) and Section 2.

(Doc. 69, at 6-7).  Counts Seven and Nine of the Superseding Indictment incorporate

71

Count Six and Count Eight of the Indictment, which provide as follows:

> On or about October 26, 2016, in the Northern District of Georgia, the defendants, TEVIN MITCHELL, TYVONNE WILEY and TOREY STARLING, aided and abetted by each other and others known and unknown to the grand jury, did obstruct, delay and affect commerce by robbery, as that term is defined in Title 18, United States Code, Section 1951, in that the defendants did knowingly and unlawfully take property, that is United States currency, belonging to the Hibbett Sports[4] . . . a business then engaged in interstate commerce in the presence of an employee of the business, by means of actual or threatened force, violence and fear of injury to the person of the employee, in violation of Title 18, United States Code, Section 1951(a) and Section 2.

(Doc. 69, at 5-7).  An indictment charging a defendant with aiding and abetting an individual in violation of Section 924(c) is sufficient if it tracks the elements of Section 924(c) and identifies the individuals who are part of the scheme.  United States v. Williams, 181 F. App'x 945, 948-49 (11th Cir. 2006); United States v. Brown, 151 F. App'x 787, 793 (11th Cir. 2005).   The elements for brandishing a firearm in violation § 924(c)(1)(A)(ii) are:  (1) committing a crime of violence, (2) using or carrying a firearm in relation to that crime; and (3) "knowingly brandish[ing] that firearm during the commission of the crime."  United States v. Butler, 572 F. App'x 683, 685 (11th Cir. 2014).  Counts Seven and Nine track the language of 18 U.S.C. § 924(c) and contain the essential elements of brandishing a firearm in violation of 18 U.S.C. 924(c).  (Doc. 69).  Counts Seven and Nine  include the first element, committing a crime of violence, by

---

[4] Count Six referenced a Hibbett Sports Store located at 1145 Woodstock Road, in Roswell, Georgia, and Count Eight referenced a Hibbett Sports Store located at 781 Whitlock Avenue in Marietta, Georgia.

AO 72A
(Rev.8/82)

incorporating the robberies alleged in Counts Six and Eight. (Doc. 69); United States v. St. Hubert, 909 F.3d 335, 345 (11th Cir. 2018) (noting that Hobbs Act robbery qualifies as crime of violence); United States v. Grace, 711 F. App'x 495, 502-03 (11th Cir. 2017) (holding that "a Hobbs Act robbery qualifies as a crime of violence under the elements clause of § 924(c)"), cert. denied, 138 S. Ct. 1295 (2018); In re Colon, 826 F.3d 1301, 1305 (11th Cir. 2016) (holding that aiding and abetting Hobbs Act robbery qualifies as a crime of violence under § 924(c)). Counts Seven and Nine also include the second element, using or carrying firearm in relation to the crime, by alleging that Starling "use[ed], carr[ied], and brandish[ed] a firearm during and in relation to a crime of violence." Compare 18 U.S.C. § 924(c)(1)(A) with (Doc. 69). Finally the Government includes the third element by alleging that Starling "knowingly" brandished a firearm in violation of Section 924. (Doc. 69). Furthermore, the Indictment sufficiently alleges aiding and abetting because it references 18 U.S.C. § 2, and identifies the persons who Starling allegedly aided and abetted in committing the violation. United States v. Albury, No. 8:11-cr-410-T-23TBM, 2012 WL 2912517, at *2 (M.D. Fla. July 16, 2012) (explaining that indictment sufficiently stated aiding and abetting charge where it referenced 18 U.S.C. § 2 and that it is not necessary for the Government to even cite the aiding and abetting provision in the charging instrument) (citing United States v. Martin, 747 F.2d 1404, 1407 (11th Cir. 1984) (explaining that aiding and abetting need not be specifically alleged in the indictment)). Because the Superseding Indictment includes all three elements for brandishing a firearm in violation of Section 924(c) and uses the word

73

"firearm," it is sufficient.  Williams, 181 F. App'x at 949 (explaining that indictment sufficiently charged a Section 924(c) violation where it identified the defendant's co-conspirators, tracked the elements of the statutes and estimated the time span of the conspiracy and the firearms the defendants possessed).

Defendant Starling urges that Counts Seven and Nine of the Superseding Indictment should nonetheless be dismissed because a federal agent admitted that Starling had not pulled a gun on anyone.  The fact that Starling might not have been the one who pulled a gun on the robbery victims does not mean that he did not violate Section 924(c) as charged.  Starling need only have constructive possession of a firearm to violate Section 924(c).  United States v. Kinsey, 607 F. App'x 884, 887-88 (11th Cir. 2015) (citing United States v. Farris, 77 F.3d 391, 395 (11th Cir. 1996)).  To that end, Starling has been charged with knowingly using, carrying, and brandishing a firearm.  Thus, Starling can be convicted under the "use" prong or the "carry" prong of Section 924(c). Id. at 887-88; see also United States v. Rolon, 445 F. App'x 314, 327 (11th Cir. 2011) (explaining that where an indictment charges in the conjunctive several means of violating a statute, a conviction may be obtained on proof of only one of the means). Likewise, the Government need only prove either "use" or "carry," even though the indictment alleges "use *and* carry" instead of "use *or* carry."  Rolon, 445 F. App'x at 326-27 (11th Cir. 2011) (holding that the district court did not err when it instructed the jury that they may find the defendant guilty of either use *or* carry, though the indictment stated use *and* carry); see also United States v. Tyler, 213 F. App'x 902, 905 (11th Cir. 2007)

74

("The government is not required to prove both using and carrying; that statute requires either use or carry."); United States v. Chirinos, 112 F.3d 1089, 1095 (11th Cir.1997). Starling can violate the carry prong even if he did not carry the weapon on his person and only drove the getaway vehicle. United States v. Leonard, 138 F.3d 906, 910 (11th Cir. 1998); Chirinos, 112 F.3d at 1095; see also United States v. Savage, 653 F. App'x 754, 755 (11th Cir. 2016) (explaining that a defendant can carry a firearm by conveying it in a vehicle). Thus, Starling can be convicted under Section 924(c) even if he merely transported a firearm.

At a minimum, Starling can be convicted pursuant to Section 924(c) under an aiding and abetting theory, even if he did not personally brandish the firearm himself. "The aiding and abetting statute allows the jury to find a person guilty of a substantive crime even though that person did not commit all acts constituting elements of the crime" and someone else committed the substantive offense. United States v. Simpkins, 240 F. App'x 334, 341 (11th Cir. 2007); see also United States v. Steele, 733 F. App'x 472, 475-76 (11th Cir. 2018). Although Section 924(c) does not allow guilt by association, a driver of a getaway car, for instance, could be culpable under Section 924(c) where the driver was aware of the presence of the firearm and was vital to the transportation of the weapon during the commission of the crime, because the driver knowingly benefitted from the protection afforded by the firearm carried, used, or brandished by his companion. Bazemore v. United States, 138 F.3d 947, 949 (11th Cir. 1998) (holding that ample evidence linked defendant to the gun for purposes of conviction under an aiding and

75

abetting theory under the carry prong because defendant drove the car which carried both the gun and co-defendant who used the gun during the drug deal and because the defendant knowingly accepted the gun's protection while he inspected the marijuana); see also United States v. Hill, 732 F. App'x 759, 763 (11th Cir. 2018) (explaining that sufficient evidence existed to sustain charge of aiding and abetting the brandishing of a firearm during a bank robbery under Section 924(c) even though defendant did not personally carry a gun as defendant had given codefendant firearm to use, defendant planned the robbery with codefendants, and each of the robbers had an assigned role); Simpkins, 240 F. App'x at 341 (sustaining conviction for aiding and abetting the carrying of a firearm under Section 924(c) where defendant observed one codefendant give another codefendant a gun, waited in the getaway car while codefendants committed armed robbery, and then drove the getaway car away); United States v. McKinney, 135 F. App'x 313, 322-23 (11th Cir. 2005) (explaining that defendant was culpable under aiding and abetting theory even though he did not own firearms because defendant accepted the protection of the firearms when he drove a vehicle while he and codefendants sold drugs that day knowing there were two firearms in the vehicle which he could access  if he wanted to do so).

Starling argues the Government has asserted that he was the driver during the robberies, but has not presented evidence in support.  There is no provision for a pretrial determination of the sufficiency of the evidence; the sufficiency of a criminal indictment is determined from its face.  United States v. Sharpe, 438 F.3d 1257, 1263 n.3 (11th Cir.

76

2006) (explaining that it was improper for trial court to dismiss indictment based on overall sufficiency of evidence presented at trial, which was not part of the indictment); see also United States v. Salman, 378 F.3d 1266, 1267-68 (11th Cir. 2004) (quoting United States v. Critzer, 951 F.2d 306, 307 (11th Cir. 1992)).  As discussed above, the indictment passes muster on its face.  Furthermore, the fact that the indictment itself did not inform Starling that he was the driver of the getaway car does not support the notion that the indictment should be dismissed.  "It is not necessary for an indictment . . . to allege in detail the factual proof that will be relied upon to support the charges.  That information, if essential to the defense, can be obtained by a motion of a bill of particulars."  Sharpe, 438 F.3d at 1263 n.3.  Accordingly, Defendant Starling's Motion to Dismiss Count 7 and Count 9 of the Superseding Indictment should be **DENIED**. (Doc. 91).

## DEFENDANNT TYVONNE WILEY'S MOTION TO DISMISS, OR, IN THE  ALTERNATIVE, MOTION TO SEVER DEFENDANT

## I.    BACKGROUND

In Defendant Wiley's Motion to Dismiss or, in the Alternative, Motion to Sever Defendant (Doc. 58), Defendant Wiley contends that he has been improperly joined in the Superseding Indictment because each Defendant is alleged to have conspired in separate conspiracies with multiple offenses occurring in Oklahoma, Texas, and Georgia.  (Doc. 58).  Wiley argues the Indictment fails to allege any connection among Defendants, their alleged crimes, or the several businesses that were victims of the robberies.  In support,

Wiley reasons that the only aspects of the various counts that are in common are the allegations of the robbery, the firearm used in commission of the robbery, and the fact that the various offenses involve a robbery of a sporting store business.  The Government responds that Wiley's joinder in the Indictment was proper because the Defendants engaged in the same series of acts or transactions.  In support, the Government argues that the robbers used consistent strategies, vehicles, and weapons.  The Government points out that the robbers targeted the same types of stores, each robbery featured the use of the same strategy for escape (ordering the occupants of the store to lay on the floor and count to 100), and the robbers used firearms in the robberies and black face masks.

## II.   <u>LEGAL ANALYSIS</u>

This Court finds that Defendant Wiley is properly joined in the Indictment.  Rule 8(b) of the Federal Rules of Criminal Procedure provides that it is proper for an indictment to charge two or more defendants together if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting the offenses.  Fed. R. Crim. P. 8(b).  Rule 8 is broadly construed in favor of initial joinder.  <u>United States v. Dominguez</u>, 226 F.3d 1235, 1238 (11th Cir. 2000).  "Although one of the goals of joinder is to promote judicial economy, a countervailing purpose of Rule 8(b) is to prevent the cumulation of prejudice growing out of charging several defendants with similar but unrelated offenses."  <u>United States v. Weaver</u>, 905 F.2d 1466, 1477 (11th Cir. 1990).  "The question of whether initial joinder is proper under Rule 8(b) is to be determined before trial by examination by the trial court of the

78

allegations stated on the face of the indictment." Weaver, 905 F.2d at 1476.  That being said, when a prosecutor faced with a Rule 8 motion challenging joinder under the Indictment, proffers the expected evidence which shows the requisite connection between the charges to justify joinder, severance should not be ordered.  Dominguez, 226 F.3d at 1241; see also United States v. Paul, 194 F. App'x 792, 796-97 (11th Cir. 2006) (explaining that when faced with a Rule 8 motion to sever, if the indictment on its face is insufficient to show proper joinder, the prosecution may proffer evidence showing a sufficient connection between the charges).  Rule 8 requires only that the government allege, not prove, the facts necessary to sustain joinder.  Dominguez, 226 F.3d at 1241 n.8.

In order to meet the same series of acts or transaction requirement, the Government "must demonstrate that the acts alleged are united by substantial identity of facts and/or participants[; . . . however, each] participant need not participate in all acts or even know the other participants' roles in the ventures."  United States v. Holloway, 971 F.2d 675, 679 (11th Cir. 1992).  Joinder of two or more defendants in the same indictment under Rule 8(b) is proper, for example, where the "indictment charges multiple defendants with participation in a single conspiracy and also charges some but not all of the defendants with substantive counts arising out of the conspiracy."  United States v. Liss, 265 F.3d 1220, 1227 (11th Cir. 2001); United States v. Weinrich, 586 F.2d 481, 495 (5th Cir. 1978); United States v. Cole, No. 1:10-CR-00468-TCB-JFK, 2012 WL 3229383, at *3 (N.D. Ga. July 18, 2012).  Each co-conspirator need not have participated in all acts or

been involved in every phase of the venture to be joined together in the same indictment. Holloway, 971 F.2d at 679; United States v. Bryan, 843 F.2d 1339, 1342 (11th Cir. 1988); see also United States v. Jones, 913 F.2d 1552, 1562 (11th Cir. 1990) (noting that joinder has been held proper where an "indictment charges multiple defendants with participation in a single conspiracy and also charges defendants with substantive counts arising out of the conspiracy."). Nor must each participant be aware of the other participants' roles and identities. United States v. Wilson, 894 F.2d 1245, 1253 (11th Cir. 1990). It is sufficient for the government to demonstrate that the acts alleged are united by some substantial identity of facts or participants. Wilson, 894 F.2d at 1253; United States v. Andrews, 765 F.2d 1491, 1496 (11th Cir. 1985) ("The character of the acts must have been similar, . . and each of the actors must have known that he acted in furtherance of a common plan in which other participants were involved.").

In this case, there was enough similarities between the crimes charged and the individuals allegedly involved in them to justify including all of the counts in one indictment. First, based on the evidence the Government has proffered, a series of armed robberies of both GameStops and Hibbett Sports Stores in Oklahoma, Texas, and Georgia occurred in a less than two month time period. (Gov't's Br. 2-5). The robbers typically brandished a firearm after entering the store and demanded that employees give them money. (Gov't's Br. 2-5). In many of the cases, the suspects wore similar clothing, such as black clothing, a black face covering, or red shoes. (Id.). Additionally, the facts and circumstances otherwise connected the robbery to Wiley because the suspected getaway

80

car was registered to Wiley's girlfriend and believed to be used in multiple robberies connected to Wiley, the suspect had a visible tattoo on his neck like Wiley's tattoo, or the suspect wore clothing similar to the clothing found during the search of the Favor Road premises and vehicles present at the time Wiley was there.  Furthermore, a common denominator of the robberies is the manner in which the suspects made their getaway, in that in each robbery, the suspects ordered the victims to the floor and to count to 100 before getting up.  (Gov't's Br. 2-5).  Under these circumstances, this Court concludes that there same series of acts or transactions requirement is met.  See United States v. Whitehead, 567 F. App'x 758, 770 (11th Cir. 2014) (concluding that counts concerning separate bank robberies occurring a couple years apart were properly joined because they were similar in the type of crimes charges and the similarities in how the crimes were perpetrated); United States v. Bowers, No. 8:12-CR-550-T-30TGW, 2013 WL 2708869, at *2 (M.D. Fla. June 11, 2013) (explaining that robbery offenses were properly joined under Rule 8(a) because they were of the same or similar character where they each occurred over a six-week period using a similar manner and means); United States v. Cole, No. 1:10-CR-00468-TCB-JFK, 2012 WL 3229383, at *3 (N.D. Ga. July 18, 2012) (explaining that where all of the charged bank robberies occurred within a two and a half year period, took place in metro Atlanta mostly at Wachovia, Chase, or Wells Fargo locations, the method of robbery involved armed participants who engaged in a take over of the bank and involved use of a stolen get-away vehicle, the robbers wore wigs and/or masks and jumped on the teller counters, and participants in the robberies identified the

81

defendant as the organizer for all the robberies, the robberies were part of the same series of transactions and a common thread connected them).  Accordingly, Wiley's Motion to Dismiss should be **DENIED**.[5]  (Doc. 58).

### DEFENDANT WILEY'S MOTION TO SUPPRESS (DOCS. 60, 85)

Defendant Wiley also argues evidence seized as a result of his arrest should be suppressed because neither the Texas warrant for his arrest nor his arrest on October 28, 2016, in Cobb County, was based upon probable cause.  Additionally, Wiley argues the November 1, 2016 search warrant permitting Detective Raissi to take pictures of his tattoos should also be suppressed because none of the robberies had been connected to him at the time the warrant issued.  In support, Wiley contends that when obtaining the November 1, 2016 search warrant, Detective Raissi evaded answering the magistrate judge's questions regarding whether witnesses to the robberies described the robbers as resembling Wiley and then inaccurately claimed that the officers in Dallas had obtained a positive identification on the suspects for the Dallas robberies.

## I.    The Texas Arrest Warrant

Wiley argues the affidavit Detective Grubbs offered in support of the Dallas County, Texas arrest warrant does not establish probable cause because there is insufficient evidence to connect him to the robbery of the Dallas GameStop.  Wiley points

---

[5] Although Defendant Wiley filed an alternative Motion to Sever Defendant (Doc. 61), this Court has not addressed the Motion because it has been deferred to the District Court.  (See Doc. 66).

out that (1) the warrant affidavit contains information about a J. Tejeda, a witness present in the store as a customer as well as other witnesses, but does not include a statement from the witness or an eyewitness description of the robbers; (2) there are no witness statements from those present at the GameStop or outside the GameStop, who can connect the robbery to Wiley; (3) Detective Grubbs admitted that the GameStop surveillance video was not clear enough to connect Wiley to the robbery and that when the Dallas police stopped him, Wiley was not wearing the same clothing as the robbers were wearing in the GameStop video; (4) the search warrant affidavit indicated that the female with Mitchell and Wiley outside the parking deck had a lot of money, but omitted to state that she told the officers that she had obtained the proceeds from being a dancer and that officers had given the money back to her, leaving the magistrate to infer that the large quantity of money was connected to the robbery when it was likely not; (5) although a tracker was found in the Ford Fiesta in the parking deck, Wiley had not been seen in the Ford Fiesta and there was nothing to connect Wiley to the Ford Fiesta; (6) the affidavit makes no mention of the fact that officers stopped and detained Wiley, searched him, found no items connected to the robbery, and released him; and (7) the affidavit does not indicate how the affiant came to the conclusion that Wiley was one of the two suspects at the GameStop and merely makes conclusory statements that two suspects later identified as Wiley and Mitchell walked through the front door of the GameStop.

In this Court's view, the search warrant affidavit adequately supplies probable cause for the Texas arrest warrant. The Fourth Amendment provides that "no Warrants

83

shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. Const. amend. IV; Paez v. Mulvey, 915 F.3d 1276, 1285 (11th Cir. 2019).  Thus, a warrant for an arrest must be supported by sufficient information to establish probable cause.  Paez, 915 F.3d at 1285.  An arrest made without probable cause is an unreasonable seizure in violation of the Fourth Amendment.  Paez, 915 F.3d at1285; Merenda v. Tabor, 506 F. App'x 862, 865 (11th Cir. 2013).  Probable cause for an arrest exists "when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime. Paez, 915 F.3d at 1285; Merenda, 506 F. App'x at 865.  "Probable cause is not a high bar" and "does not require convincing proof that an offense was committed."  Paez, 915 F.3d at 1286.

In this case, Detective Grubbs included sufficient information in his affidavit submitted in support of Wiley's arrest warrant to justify the reasonable deduction that Wiley had been involved with the robbery of the Dallas Texas GameStop.  At the time of the arrest warrant, Grubbs had security video from the GameStop and video from the body camera of an officer at the scene as well as information from the tracker inside the stolen money which was tracked to the parking garage where police intercepted Mitchell and Wiley and an unknown female shortly thereafter.  (Gov't's Ex. 5; Tr. 108, 118). According to Detective Grubbs, when police intercepted Mitchell and Wiley inside the parking garage, Wiley was accompanied by Mitchell, who was still wearing the exact same clothing as the robber, with the exception of the hoodie.  (Gov't's Ex. 5; Tr. 118,

120, 125, 128-29, 135-37).  While Wiley's presence in vicinity of Mitchell is not enough by itself to establish probable cause, Wiley's presence near Mitchell plus additional factors would lead a prudent person to believe that Wiley had committed the offense with Mitchell.  United States v. Cruz, 428 F. App'x 912, 914 (11th Cir. 2011); United States v. Gonzalez, 70 F.3d 1236, 1238 (11th Cir. 1995); United States v. Silva, 957 F.2d 157, 160 (5th Cir. 1992) (explaining that while companionship or propinquity to an arrestee does not alone establish probable cause, it is a factor that may be considered in the probable cause analysis).  In this case, additional factors connected the robbery to Wiley.  First, Wiley was connected to Mitchell and the Ford Fiesta[6] because they were located together in the parking garage where the Ford Fiesta had recently been parked not long after the robbery had taken place.  According to the warrant affidavit, the police began following the tracker signal five minutes after the robbery.  (Gov't's Ex. 5).  Second, police officers had observed the Ford Fiesta entering the garage while they were following the tracker signal.  (Tr. 120-22; Gov't's Ex. 5).  Third, the Ford Fiesta was registered to Mitchell, who police had observed accompanying the individual believed to be Wiley in the parking garage.  (Tr. 120-22; Gov't's Ex. 5).  Once police located the Ford Fiesta in the parking garage, they observed a rifle with a light-colored pillow case inside and witnesses had described the robber suspected to be Wiley as carrying a long

---

[6] Wiley argues Detective Grubbs failed to mention that he was not seen in the Ford Fiesta.  This was not a material omission because nothing within the affidavit suggested that Wiley was seen in the Ford Fiesta.  As discussed below, however, sufficient information ties Wiley to the Ford Fiesta.

rifle concealed in a light-colored pillow case, leading to the reasonable inference that the second robber may still be with Mitchell and may be nearby. (Gov't's Ex. 5; Tr. 114, 120). Furthermore, police observed Wiley in the parking garage wearing black pants like the robber had worn. Additionally, Detective Grubbs averred that he confirmed the identities of suspects Mitchell and Wiley upon reviewing the pictures of the suspects. (Gov't's Ex. 5). Given that police are not required to meet a particularly high bar to establish probable cause, the Court is convinced that the facts within the search warrant affidavit established probable cause. United States v. Edmondson, 791 F.2d 1512, 1513-15 (11th Cir. 1986) (concluding that probable cause for arrest existed where police obtained license plate of car used in aborted robbery, found that it was registered to a female, proceeded to female's apartment where female was only person registered as resident of apartment, witnesses on premises identified photograph of robber taken by bank surveillance camera of a different robbery as that of a male who had been seen with female on several occasions, and an agent saw man resembling the suspect in bank surveillance photograph step outside the apartment to smoke a cigarette and then return inside); DaSilva v. Lamberti, No. 08-62106-CIV, 2009 WL 5125375, at *5 n.8 (S.D. Fla. Dec. 22, 2009) (concluding that arguable probable cause existed to arrest rape suspect who was in location where rapist and fled and who matched description of the rapist described to be African-American, in his mid 20s-30s, with a medium build, and wearing dark shorts); see also Ovington v. Atlanta Inv. Grp., 651 F. App'x 951, 954 (11th Cir. 2016) (indicating that although photo did not show face of the robber because he was

86

wearing a mask, it included significant details that could support an identification such as the presence of a tattoo, shoes, hat, clothing, posture, and the width of the robber's shoulders).

Wiley suggests that this information was not sufficient, however, because the affidavit excluded information that the GameStop surveillance video was not clear enough for Detective Grubbs to see Wiley's face. Officers may "not lie about or conceal critical information" when presenting their warrant affidavits. Paez, 915 F.3d at 1286. "Intentional or reckless material misstatements or omissions in a warrant affidavit . . . could violate the Fourth Amendment." Paez, 915 F.3d at 1287. When determining whether a misstatement or omission in a warrant affidavit amounts to a violation of the Fourth Amendment, courts determine whether there was an intentional or reckless misstatement or omission. Paez, 915 F.3d at 1287. Next, the materiality of the information is examined "by inquiring whether probable cause would be negated if the offending statement was removed or the omitted information was included." Paez, 915 F.3d at 1287. To that end, the court considers whether "after deleting the misstatements, the affidavit is insufficient to establish probable cause." Paez, 915 F.3d at 1287.

Wiley suggests that Detective Grubbs' statement that he confirmed the identity of Mitchell and Wiley when he reviewed their pictures was misleading because the video tape of the robberies was not clear enough to indicate that it was hin in the video. (Tr. 118-19). Although Detective Grubbs admits that he could not identify Wiley's face from the video evidence, Detective Grubbs states that he could identify Wiley based on the

87

type of pants he was wearing, his height, and his weight. (Tr. 118-20). Detective Grubbs testified that Mitchell was wearing the exact same clothing worn during the robbery, and Wiley was "still wearing his zipper pants, but the rest of his clothing is changed. But the height, weight, everything else matches for the two." (Tr. 120). Detective Grubbs further testified that when officers intercepted Wiley, like the robbery suspect, Wiley was wearing a black pair of pants which had zippers in the same location as the pants the robbery suspect was wearing. (Tr. 129). Considering the totality of the evidence, Detective Grubbs' omission that he could not view Wiley's face from the video evidence is not material. Based on Detective Grubbs' statement that the height, weight and build, pants, and "everything else" matched for Wiley, plus the other evidence in the affidavit concerning Wiley's proximity to the Ford Fiesta in close temporal proximity with the robbery, Wiley's connection with Mitchell and the presence of the weapon believed to be utilized by the suspect who was not Mitchell found inside the Ford Fiesta, and Mitchell's connection to the robbery, there was a fair probability that Wiley was the second robber.

Wiley also argues the warrant affidavit mentioned that the woman accompanying Wiley and Mitchell was carrying a large amount of cash, but omitted the fact that the woman had been released after she explained the presence of the cash by the fact that she was a dancer. Wiley also points out that he was not found wearing the same clothing as the robber and the police searched him at the apartment garage, but did not find anything and released him. The Court disagrees that this evidence was material. It is reasonably

inferred that robbers who did not want to get caught would change their clothes and would not carry large amounts of cash. Thus, the fact that money, other evidence, or the clothes worn by the robber, was not found directly on Wiley's person is of no moment. Likewise, given the aforementioned evidence regarding Wiley and Mitchell's likely connection to the robbery, Grubbs, in hindsight, was free to disbelieve his female companion's explanation that she had a large amount of cash because she was a dancer and properly consider it evidence. Even without the evidence that the female companion possessed a large amount of cash, however, the remaining evidence is sufficient to establish probable cause. Nor does this Court find the police's decision to release the companions in the parking garage at the scene material. At the point when police intercepted Wiley and his companions, they had not found the Ford Fiesta with the rifle and would not be certain that the robbers were nearby. The officers also had not had the opportunity to study the video evidence. Thus, they would not have enough evidence at that point to support the notion that they could legally hold the suspects. Therefore, the fact that the police did not make an arrest at that point does not dissipate probable cause.

## II.   **The Favors Road Arrest**

Even if the Dallas, Texas arrest warrant was not based on probable cause, however, Wiley's actual arrest more than a month later at the Favors Road residence was still justified by probable cause. Wiley argues his arrest at the Favors Road residence on October 28, 2016, was not supported by probable cause because (1) Detective Raissi admitted that prior to arresting Wiley, he had never heard of Wiley, (2) the vehicles

89

associated with robberies were not registered to Wiley and Wiley had not been seen using them; and (3) there was no indication in the search warrant for the Favors Road residence that Wiley had been involved in any crime.  In response, the Government argues Wiley's arrest was based on probable cause because he attempted to flee the police and had thus, committed the criminal offense of obstruction.  The Government further argues that once Wiley was taken to the Cobb County headquarters, law enforcement officers learned of the Texas arrest warrant and thus, had probable cause for his arrest for the robberies.  On reply, Wiley argues the previous warrant for his arrest did not provide a justification for his October 28, 2016 arrest because as of October 28, 2016, none of the officers interacting with him knew about the Dallas, Texas warrant.  Wiley further points out that none of the officers investigating the Atlanta robberies had any information connecting him with the robberies.

Law enforcement officers had probable cause to arrest Wiley on October 28, 2016, for obstruction.  Under O.C.G.A. § 16-10-24(a), "a person who knowingly and willfully obstructs or hinders any law enforcement officers . . . in the lawful discharge of his or her official duties" commits obstruction.  O.C.G.A. § 16-10-24(a).  The defendant's refusal to comply with an officer's lawful directive or command amounts to obstruction under Georgia law.  Lowe v. Smith, 759 F. App'x 797, 803 (11th Cir. 2018) (officers had probable cause that defendant was committing the crime of obstruction when he refused the officers' instruction to step outside the home so that the officers could investigate a 911 call that a father was killing a child's mother); WBY v. DeKalb Cty., 695 F. App'x

90

486, 493 (11th Cir. 2017).  Additionally, a defendant's resistance of a lawful detention amounts to obstruction.  United States v. Akinlade, 519 F. App'x 529, 534 (11th Cir. 2013) (concluding that officers had probable cause to arrest defendant for obstruction where the defendant resisted officer's lawful attempt to detain him, actively struggled with the officers, and kicked and crawled in an attempt to flee); United States v. Foskey, 455 F. App'x 884, 888 (11th Cir. 2012) (probable cause supported arrest for obstruction following defendant's flight despite officer's lawful command to stop).

In this case, officers had a lawful basis for detaining Wiley because they were executing a search warrant of the Favors Road residence.  As discussed above, it is clear in the Eleventh Circuit that a warrant to search a residence for contraband justified by probable cause "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is being conducted." Michigan v. Summers, 452 U.S. 692 (1981); Gomez v. United States, 601 F. App'x 841, 846-47 (11th Cir. 2015); Sampson v. City of Brunswick, 549 F. App'x 858, 860 (11th Cir. 2013) (explaining that the Supreme Court has held "that police officers have a 'categorical' right to detain occupants of a premises while executing a search warrant for contraband").  Here, although Wiley initially complied with the officers' instructions to get down on the ground, he then took off at a full sprint, broke through the SWAT perimeter, and ignored the officers' commands to stop.  (Tr. 14, 16, 39-40, 53-61).  Even when the officers caught up to Wiley, Wiley resisted, struggled, and tried to get away.  (Tr. 15, 56, 61). Part of the justification for the rule permitting officers to detain individuals during the

91

execution of a search warrant is to prevent flight in the event that incriminating evidence is found and to facilitate the orderly completion of the search since detainees might be persuaded to open locked doors or containers in order to avoid damage from the use of force. Muehler v. Mena, 544 U.S. 93, 98 (2005). Such legitimate interests are at play in this case and it is clear that the law enforcement officers' attempt to detain Wiley and apprehend him during his flight was lawful. See, e.g., Louis v. United States, Nos. 2:11-cv-679-FtM-29CM, 2:06-cr-4-FTM-29SPC, 2014 WL 5093850, at *4 (M.D. Fla. Oct. 10, 2014) (petitioner's flight during search of apartment justified officer's pursuit and petitioner's arrest after petitioner resisted the investigators trying to detain him); United States v. Torres, No. 1:06-CR-00351-WSD-LTW, 2008 WL 11380151, at *18 (N.D. Ga. Mar. 21, 2008) (apprehension of fleeing defendant in connection with execution of search warrant was lawful under the Supreme Court's decision in Summers). Because Wiley resisted his lawful detention, the officers had probable cause to charge him with obstruction. Akinlade, 519 F. App'x at 534; Foskey, 455 F. App'x at 888.

The fact that the record does not indicate that the police officers actually arrested Wiley for obstruction does not change the result. Where the officers have probable cause to arrest the defendant, their motive in making the arrest does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment. Devenpeck v. Alford, 543 U.S. 146, 153 (2004) (explaining that the officer's subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause); United States v. Flippo, 759 F. App'x 907, 909 (11th Cir. 2019); Rogers

92

v. City of Orlando, 660 F. App'x 819, 824 n.8 (11th Cir. 2016); Collins v. Ensley, 498 F. App'x 908, 910 (11th Cir. 2012) ("When an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest."); Hendricks v. Sheriff, Collier Cty., 492 F. App'x 90, 94 (11th Cir. 2012) (explaining that "[a]n officer's subjective reliance on an offense for which no probable cause exists does not make an arrest faulty where there is actually probable cause to support some other offense" and that arrest was not faulty where evidence before the Sheriff's Department would have given deputies actual probable cause to arrest for less serious offenses); Lee v. Ferraro, 284 F.3d 1188, 1195-96 (11th Cir. 2002); United States v. Vasquez-Ortiz, No. 1:07-CR-348-CC-AJB, 2008 WL 11449053, at *14 n.28 (N.D. Ga. June 13, 2008) (explaining that question of whether there was probable cause to arrest is viewed objectively and not based on the officer's subjective intentions). Furthermore, the Supreme Court has held that the police may make a custodial arrest of a person, even if the punishment for the offense is limited to payment of a fine. Atwater v. City of Lago Vista, 532 U.S. 318 (2001); Rogers, 660 F. App'x at 824; Lee, 284 F.3d at 1196. Because the Favors Road arrest was justified by probable cause, evidence obtained as a result of the arrest should not be suppressed.

## III.   The November 1, 2016 Search Warrant

Wiley argues that evidence obtained as a result of the November 1, 2016 search warrant permitting officers to photograph his tattoos should be suppressed because the

93

warrant did not provide probable cause that the search would yield evidence of a crime. In support, Wiley contends that the information offered in support of the search warrant did not connect Wiley to the robberies.  Additionally, Wiley argues Detective Raissi misled the magistrate judge when he advised him that the detectives in Dallas positively identified him in connection with the Dallas robbery.

In attempting to ensure that search warrant affidavits comply with the Fourth Amendment's prohibition against unreasonable searches and seizures resulting from warrants issued without probable cause, the issuing magistrate "is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994); see also United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999). "[P]robable cause deals 'with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Gates, 462 U.S. at 241; Miller, 24 F.3d at 1361. "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Gates, 462 U.S. at 241; Miller, 24 F.3d at 1361.

Wiley's argument that the police did not have evidence connecting him to the

94

robberies focuses for the most part on the period of time prior to obtaining the search warrant for the Favors Road residence. Wiley contends that at the time police obtained the search warrant for the Favors Road residence, there was no indication that he was associated with the robberies or the suspected getaway vehicles parked from time to time at the residence. Wiley's focus on the period of time when a search warrant was obtained for the Favors Road residence, however, is not warranted under the circumstances. The search warrant permitting the photographing of Wiley's tattoos was obtained after the search warrant for the Favors Road residence, and by that time, the police had a lot more evidence at their disposal linking Wiley to the robberies. Detective Raissi explained in the warrant application that Wiley was suspected of armed robbery in violation of O.C.G.A. § 16-8-41, aggravated assault with a deadly weapon in violation of O.C.G.A. § 16-5-21, and violation of the Georgia Gang Statute (O.C.G.A. § 16-15-4). Detective Raissi advised Cobb County Magistrate Judge Don Hicks that he believed Wiley was involved in seven robberies in the metro Atlanta area, four of which occurred in Cobb County. Detective Raissi described the robberies in his affidavit and detailed common threads between each of the robberies, such as the type of weapon used, the clothing worn by the robbers, the getaway vehicles used, and the method of controlling the victims. Detective Raissi also offered the following information connecting Wiley to the robberies in support of his application for a warrant: (1) the police officers in Dallas, Texas made a positive identification of Wiley in connection with the September 2016 armed robbery of a GameStop and obtained a warrant for his arrest; (2) during the Dallas robbery, a

95

GameStop employee placed a tracker in a bag of money given to the robbers, the Dallas Police Department followed the tracker signal inside a parking garage and found a car, registered to Defendant Mitchell, with a gun in it, and although there were no people in the vehicle, the officers then found Wiley and Mitchell inside a stairwell in the parking garage and obtained a positive identification of Wiley and Mitchell; (3) the female owner of a white Hyundai Sonata believed to be used in a September 27, 2016 armed robbery of a Hibbett Sports Store in Marietta, Georgia, and a October 15, 2016 armed robbery of a GameStop, stated that she let Wiley borrow her car; (4) in the September 27, 2016 armed robbery of the Hibbett Sports, the robbers used a silver handgun and wore black face coverings and red shoes, and the robbers instructed the victims to count to 100 before getting up; (5) in the October 15, 2016 robbery of the GameStop, a male suspect wearing some type of facial cover robbed the store with a large firearm, ordered the occupants of the store to count to 100 before departing in the Hyundai Sonata, for which a customer recorded the tag number; (6) police located the white Hyundai Sonata and followed it to the Favors Road location; (7) police observed vehicles at the Favors Road location which were similar to the description of other vehicles utilized in other armed robberies of GameStops and Hibbetts Sports where robbers wore similar clothing and/or used similar methodologies and weapons; (8) during the execution of the search warrant of the Favors Road residence, police located firearms, black masks, and clothing believed to be used in the robberies as well as clothing Wiley was wearing when the Dallas Police Department stopped him in Texas; (9) during the execution of the search warrant at the

96

Favors Road location, Wiley fled on foot and was apprehended; and (10) Codefendant Mitchell admitted to waiting in the getaway car, a 2011 Hyundai Sonata, while others committed the September 27, 2016 robbery of a Hibbett Sports. (Gov't's Ex. 5a). Based on this information, a reasonable officer could believe that Wiley participated in the robberies, that there was evidence of Wiley's participation in the robberies at the Favors Road house, and that Wiley fled during the execution of the search warrant at the Favors Road location in order to avoid apprehension for the robberies.

Wiley also contends that Detective Raissi's statement that the Texas police officers had a positive identification on Mitchell and Wiley and that they committed the Texas robbery was untruthful and was not supported by testimony or evidence. Detective Raissi's statement, however, was supported by the evidence. When police intercepted Wiley and Mitchell at the parking garage, they did obtain their names and dates of birth. (Gov't's Ex. 5). In addition, the officers had taken pictures of Wiley and Mitchell at the garage. (Tr. 109). Furthermore, Detective Grubbs had body camera footage from the officer who had allegedly intercepted Wiley and Mitchell shortly after the robbery. Detective Grubbs testified that he compared the body cam footage to the footage from the Texas GameStop and the pictures of Wiley and Mitchell, and concluded that the robbers of the Texas GameStop were Wiley and Mitchell. (Tr. 108-09, 118-21, 129-33; Gov't's Ex. 5). Although Detective Grubbs admitted that he could not identify faces on the footage from the robbery, Detective Grubbs testified that Mitchell was wearing the exact same clothing as the robber, and Wiley was "still wearing his zipper pants, but the rest

97

of his clothing is changed.  But the height, weight, everything else matches for the two."
(Tr. 120).  Detective Grubbs further testified that when officers intercepted Wiley, like
the robbery suspect, wiley was wearing a black pair of zipper pants which had zippers in
the same location as the pants the robbery suspect was wearing.  (Tr. 129).  Furthermore,
in light of on the aforementioned evidence connecting Wiley to the robberies, the
omission to tell Judge Hicks that officers could not discern Wiley's face from the footage
of the Texas robbery was not material.

In addition, there was probable cause that Wiley had tattoos affiliated with gang
membership and that his tattoos could be evidence of a crime.  Based on the evidence
presented in the warrant, there was a fair probability that the robberies could be connected
to gang activity in violation of the Georgia Street Gang Terrorism and Prevention Act,
O.C.G.A. § 16-15-4.  A violation of the Act may be proved by showing that the defendant
(1) is a member of a criminal street gang and (2) committed a violent act intended to
further the interests of the gang.  Anglin v. State, 302 Ga. 333, 338 (2017).  Here,
sufficient evidence suggested that Wiley was a member of a street gang.  Detective Raissi
averred that he saw a tattoo of a five-pointed star on Wiley's neck and learned from
Wiley's booking information that MOB was tattooed on Wiley's chest.  (Gov't Ex. 5a).
Detective Raissi states that based on his training and experience, both tattoos were
associated with membership in the Bloods street gang.  (Gov't Ex. 5, 5a).  Additionally,
Detective Raissi has connected Wiley to a street gang known for violence and theft.
Detective Raissi avers that in 2011, Wiley was identified as a member of the Get Money

Squad, a local Marietta criminal street gang which was known for among other things, aggravated assault, aggravated battery, and thefts. (Gov't's Ex. 5a).

Furthermore, Detective Raissi assembled sufficient evidence demonstrating a fair probability that Wiley committed a violent act intended to further the interests of the Get Money Squad gang.  Detective Raissi links Wiley to other individuals who may have participated in the criminal venture and who are associated with gang activity.  As noted above, Wiley was believed to be involved in armed robberies involving the white Hyundai Sonata.  Kiyanna Brito, the registered owner of the white Hyundai Sonata, was associated with a criminal street gang known as the Hard Head Money Click, in Marietta, Georgia.  Law enforcement followed Brito's Hyundai Sonata to the Favors Road address, where suspected evidence of the robberies was located.  Through the Cobb County Police Records Management System, law enforcement linked Brito to Devonte Adams, who had been seen at a Atlanta Motel 6 at the same time as Brito's Hyundai Sonata was there.  In 2010, Adams, like Wiley, had been documented as a member of the Get Money Squad. Adams resembled the description of one of the robbers involved in the October 15, 2016 robbery of the GameStop, which had also been connected with the white Hyundai Sonata. Likewise, Adams had also been linked to a blue Acura parked at the Favors Road house which was suspected to be involved in the September 29, 2016 armed robbery of a GameStop in Sandy Springs, Georgia.  Similar to the September 27, 2016 robbery of the Hibbett Sports which had been associated with the white Hyundai Sonata, during the September 29, 2016 robbery of the GameStop, a black male suspect holding a silver

AO 72A
(Rev.8/82)

handgun robbed the store and ordered the employees to the ground and instructed them to count to 100.  The suspect then departed in a waiting blue Acura believed to be occupied by three additional black males.  At the time of the search of the Favors Road residence, the police performed a traffic stop of the blue Acura which was being driven by Keiyana Riley-Conant.  Riley-Conant advised the police that she had allowed Adams to borrower her car.  Under the circumstances, a reasonable officer could determine, based on these connections, that there was a fair probability that Brito, Adams, and Wiley were associated and that the robberies, which shared similar methodologies and getaway cars, were done in the furtherance of gang interests.  Thus, Defendant Wiley's tattoos could be relevant to establish that he was a member of a gang.  <u>Anglin</u>, 302 Ga. at 338 (concluding that information in the warrant affidavit was sufficient to establish probable cause that evidence of violation of the street gang statute could be found if police were permitted to view and take photographs of the tattoos on the defendant's body, where defendant, who had several gang tattoos on his body, had been identified as the murderer and other suspects in the case were identifying themselves as members of the Bloods gang).  For all of the aforementioned reasons, Defendant Wiley's Motion to Suppress should be **DENIED**.  (Docs. 60, 85).

## **CONCLUSION**

Based on the foregoing reasons,

(1)   Defendant Torey Starling's Motion to Dismiss Counts 1 and 2 of the Indictment should be **DENIED**.  (Doc. 47).

100

(2)     Defendant Torey Starling's Motion to Sever Parties is **DEFERRED TO THE DISTRICT COURT**.  (Doc. 48).

(3)     Defendant Tyvonne Wiley's Motion to Dismiss or, in the Alternative, Motion to Sever Defendant should be **DENIED** as to the Motion to Dismiss, but **DEFERRED TO THE DISTRICT COURT** as to the Alternative Motion to Sever.  (Doc. 58, 61).

(4)     Defendant Tyvonne Wiley's Motion to Supress Defendant's Statements should be **DEFERRED TO THE DISTRICT COURT**.  (Doc. 59).

(5)     Defendant Tyvonne Wiley's Motion to Suppress any Evidence Pursuant to His Arrest and Evidence Obtained Pursuant to a Search Warrant of His Person and Supplemental or Particularized Motion to Suppress Evidence should be **DENIED**. (Docs. 60, 85).

(6)     Defendant Tevin Mitchell's Motion for a Bill of Particulars is **GRANTED IN PART AND DENIED IN PART.**  (Doc. 62).

(7)     Defendant Tevin Mitchell's Motion to Suppress Search and Seizure should be **GRANTED**.  (Doc. 63).

(8)     Defendant Tevin Mitchell's Motion to Suppress Statements should be **GRANTED**. (Doc. 64).

(9)     Defendant Torey Starling's Motion to Dismiss Count 7 and Count 9 of the Superseding Indictment should be **DENIED**.  (Doc. 91).

As there are no further motions pending, the undersigned certifies this case ready for trial.

The Clerk is directed to terminate the reference to the undersigned.

        **SO ORDERED AND REPORTED AND RECOMMENDED** this <u>24th</u> day of June, 2019.

_____
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

101